**In re SMITH et al.**

[Cite as *In re Smith* (1991), 77 Ohio App.3d 1.]

Court of Appeals of Ohio,
Ottawa County.

No. 90–OT–038.

Decided Aug. 30, 1991.

**2**

*Thomas G. Zraik,* for appellants.

*Ernest E. Cottrell,* Jr., guardian *ad litem.*

*Lowell S. Petersen,* Prosecuting Attorney, *Barbara Peterson* and *Patricia J. Clark,* for appellees.

SHERCK, Judge.

This is an appeal from an order of the Ottawa County Court of Common Pleas, Juvenile Division, granting permanent custody of four of appellants' children to the Lucas County Children Services Board. Because we find the trial court improperly accepted the parents' admission that their children were neglected and dependent and because appellants were prejudiced by the children's denial of proper counsel, we reverse.

Appellants, Ward and Vickie Smith, are the parents of six children: Richard, eighteen, now emancipated; Ward, Jr., fifteen; Forest, thirteen; Dawn, eleven; Maurice, nine; and Ronald, eight. In May 1983, the Smith family received a visit from Janice Briggs, a caseworker for the Ottawa County Department of Human Services ("OCDHS"). Briggs was responding to a complaint that appellants' eldest son, Richard, had come to school with a black eye. Richard told Briggs that he had sustained the black eye when struck with a board wielded by his sister, Dawn. Briggs also spoke to appellants during this visit. Appellants indicated that they were having difficulty controlling Richard's behavior.

Briggs visited the Smiths twice more in 1983. Richard's behavior continued to be a topic of discussion between Briggs and appellants during these visits. Appellants reported that Richard had been violent toward his siblings and threatening to his mother. Briggs discussed with appellants the possibility of placing Richard in a more structured environment. In December 1983, Richard was placed in St. Anthony's Villa, in Toledo, where he could receive psychological counseling.

During early September 1984, Briggs investigated an anonymous complaint about the treatment of the remaining Smith children. It was alleged that appellant Vickie Smith had been seen chasing the children with a baseball bat, and that both appellants had picked up one of the children and swung him back and forth while threatening to throw him on the stones of the driveway. It was also reported that there was incessant use of profanity among family members and that the children had been given demeaning nicknames such as "Rat," "Worm," "Jughead" and "Hotdog."

Appellant Vickie Smith denied chasing any child with a baseball bat. Appellants admitted swinging their children, but characterized this activity as play. Appellants also conceded profanity was used in the household and that the children were indeed nicknamed "Rat," "Worm," "Jughead" and "Hotdog." No further action was taken on this complaint.

At some point in the fall of 1984, appellant Ward Smith was injured and unable to work. By late September 1984, when Richard was returned to the home from St. Anthony Villa, the family, although receiving aid for dependent children, was behind in rent and utility payments. It was also at this point that appellant Vickie Smith stopped attending counseling sessions.

Richard's reintegration into the Smith home did not go smoothly. During the winter of 1984–1985, Briggs heard complaints that Richard was stealing and that he was becoming abusive to his younger brothers and sisters. Appellants and Briggs discussed again placing Richard outside the home.

4

Appellant Vickie Smith opposed this until May 1985 when Richard overdosed on his father's prescription Valium and was hospitalized.

In August 1985, Richard was placed in a residential psychiatric treatment center in Dayton. In June 1986, Richard completed his treatment in Dayton and was transferred to a group home in Norwalk.

About the time of Richard's transfer to Norwalk, appellants began experiencing behavior difficulties with another son, Forest, then ten, whose behavior seemed to follow the path created by Richard. During the next few months Forest's activities included vandalism, shoplifting, yelling obscenities, threatening school officials, and attempting to poison his youngest brother, Ronald, using their father's Valium pills. Appellants discussed this behavior with social worker Briggs who agreed to attempt to find Forest an emergency placement out of the home. In January 1987, Forest was placed in a residential care facility in Toledo.

At the same time that Forest's difficulties were developing, Richard alleged to counselors at his group home that he had been sexually abused by his maternal grandfather and stated that he, in turn, had sexually abused his younger siblings. Following this revelation it was determined that Richard's stay at his group home be extended so that he might receive sexual abuse therapy. This counseling was begun, but in May 1987, Richard ran away from the group home. Richard was returned and eventually placed in the Erie County Juvenile Detention Center as a runaway.

Following Richard's allegations and similar allegations from Forest, appellants began counseling through St. Anthony Villa, which was Forest's residential treatment center. During this time, however, appellants' relations with OCDHS began to cool.

Meanwhile, Richard's behavior deteriorated. He made several suicide attempts and was required to be restrained. In September 1987, Richard was placed at the Bury Road group home in Oregon, Ohio, for treatment. Initially, Richard's behavior improved at the Bury Road group home. In November 1987, however, following a home visit, Richard returned to the Bury Road group home with some pills, which he gave to another resident, a younger boy, telling him the pills were candy. As a result of this incident Richard was taken to the Lucas County Child Study Institute and eventually found delinquent. In early December 1987, Richard was sentenced to the custody of the Ohio Department of Youth Services.

Also in December 1987, appellants' youngest boy, Ronald, then four, was hospitalized for a drug overdose after he took some pills he had apparently removed from his father's trousers.

December 1987 and January 1988 were financially stressful times for the Smith family. In December 1987, appellant Ward Smith stated to social worker Briggs that the family was without income and was being forced to move from their home by the end of January.

On February 3, 1988, appellant Ward Smith called social worker Briggs and informed her of the family's new address in Lucas County. The same day the OCDHS filed a complaint in the Ottawa County Juvenile Court alleging that all six children were neglected and dependent in that:

"they lack proper parental care because of the faults and habits of their parents and whose environment is such as to warrant the State, in the interest of the children, in assuming their guardianship; in that their parents have failed to provide adequate supervision, causing the children to behave like wild, undisciplined animals in public places, to suffer variously from recurrent head lice, filthy skin, overdoses from ingestion of their father's medication, inadequate winter clothes, school truancy, sexual abuse, and numerous injuries, both accidental and inflicted. Parents have in past threatened to discipline children with a chainsaw, and on December 13, 1987, placed Ward Smith, Jr. in a commercial dryer for 'fun'. Agency attempts to improve family life since 1980 have made no difference."

The OCDHS requested that the court grant it permanent custody of all six Smith children. At the same time the OCDHS moved the court for temporary custody and an emergency shelter order for the Smith children. This motion was granted, and the children were removed from appellant's home.

The adjudicatory hearing on the OCDHS complaint was scheduled for August 15, 16, 17, 22, 23, 24, 29, 30 and 31, 1988. Appellee, OCDHS, called as its first witness social worker Janice Briggs. Briggs testified to the events that had occurred within the Smith family for the previous five years. She also detailed her agency's involvement in these events.

Briggs testified that in addition to the agency's involvement with the problems of Richard and Forest that she had also investigated numerous other complaints relative to the other Smith children. These complaints ranged from appellant Ward Smith's slapping one of the children in public, to head lice, to unexplained cuts and bruises, to inadequate clothing, to appellant Ward Smith allowing one of his children to enter a laundromat dryer while playing. Briggs testified that she had contemporaneously investigated each complaint, but she had failed to find any single instance of any act by the parents which she believed constituted abuse or neglect. Briggs testified that, although she disagreed with slapping children in public for disciplinary purposes and felt that nicknaming children "rat" and "worm" was demeaning, she did not believe that this constituted neglect. She also stated that she did

not consider a commercial dryer an appropriate place for a child to hide while playing hide and seek. Briggs's testimony failed to mention the use of a chainsaw in child rearing or any alleged sexual abuse by the parents.

Briggs did testify that appellants had failed to attend all the counseling sessions and parenting classes that had been imposed upon them by virtue of Richard and Forest's placement in treatment facilities. On cross-examination Briggs admitted that at the time of the hearing appellants had attended all but one of the prescribed parenting classes and that, although appellants frequently missed therapy and counseling sessions due to transportation and baby-sitting problems, appellants had attended numerous therapy and counseling sessions during the preceding five years. Briggs also admitted that in her frequent visits to the Smith homes she generally found them clean.

Social worker Briggs remained on the stand for nearly two full days. At the close of the second day's testimony, the court asked her the reason she believed that permanent custody of each of the children should be granted to the agency. With respect to Richard and Forest, Briggs responded that she believed their behavior problem constituted a threat to themselves and others. In regard to the remaining four children, Briggs testified that permanent custody should be granted to the agency because of the neglect of the family, lack of supervision and lack of hygienic care. She pointed out the Smith family moved frequently and had difficulty providing for the specific needs of the children such as "utilities, appropriate clothing, medical care, and *et cetera.*"

The following day, at the start of the third of the nine scheduled hearing days, counsel for appellee OCDHS began the day by addressing the court. Counsel indicated that the court's inquiry both on the record and in chambers as to the justification of the requests for permanent custody might indicate a confusion of the court between the adjudicatory and dispositional phases of the bifurcated proceeding. The court responded that it was aware of the difference. A recess followed during which negotiations between the parties apparently occurred because when the court returned on the record the following exchange occurred:

"THE COURT: I understand through discussions at a break that this matter has been resolved, Mrs. Petersen?

"[OCDHS COUNSEL]: That the adjudicatory phase has been, yes, Your Honor.

"THE COURT: Yes.

"[OCDHS COUNSEL]: I'm prepared to move to amend the complaint to strike, therefrom, the phrase towards the end of the body of the text which

says, And on December 13, 1987, placed Ward Smith Junior in a commercial dryer for fun. I move to strike that entire phrase. And then it's my understanding the remaining allegations, the Smiths are willing to admit.

"THE COURT: I will grant that motion continued [*sic*]. And you are going to admit the rest of the allegations contained in the complaint, Mrs. Anderson?

"[APPELLANTS' COUNSEL]: Yes, Your Honor, at this time they will enter that. May I inquire of my clients for the record, please?

"THE COURT: Sure.

"BY [APPELLANTS' COUNSEL]:

"Q. Mrs. Ward, I briefly talked to you about the complaint, and did you not agree to admit to the allegations in the complaint with the modification concerning the chain saw?

"A. Yes, I did.

"Q. Mr. Smith, I ask you the same question?

"A. Yes.

"[APPELLANTS' COUNSEL]: Thank you, Your Honor.

"THE COURT: Okay. Based on the admission, then, that the Court will find that the children involved in the complaint are neglected and dependent as alleged, and the Court will transfer this case, together with all records, to Lucas County Juvenile Court for a dispositional hearing."

On the same day the Ottawa County Juvenile Court issued a journal entry amending the complaint, accepting the Smiths' admission of neglect and dependency and ordering the matter transferred to the Lucas County Juvenile Court for disposition. The transfer was predicated on appellants' residence in Lucas County.

In Lucas County, a hearing on the transfer was held before a referee of the Juvenile Court who recommended that the court accept the case for disposition and that temporary custody of the Smith children be granted to the Lucas County Children Services Board ("LCCSB"). LCCSB filed objections to the referee's recommendations, asserting that the Lucas County Juvenile Court lacked jurisdiction to hear the case. The court eventually overruled LCCSB's objections and accepted the transfer of the case from Ottawa County. From this order LCCSB filed a timely notice of appeal with this court on April 7, 1989.

On January 26, 1990, this court ruled on LCCSB's appeal, holding that the Ottawa County Juvenile Court order transferring the Smith case to Lucas County was without statutory authority and that the Lucas County Juvenile Court erred in accepting the case. The effect of this decision was to return

the case to Ottawa County Juvenile Court for disposition. On February 2, 1990, the Lucas County Juvenile Court complied with this court's order and returned the case to Ottawa County.

During the pendency of the jurisdictional appeal, the Ohio legislature in 1988 enacted Am.Sub.S.B. No. 89 ("S.B. No. 89"). Effective January 1, 1989, S.B. No. 89 amended or created several sections of the Ohio Revised Code relating to the time requirements for temporary and permanent child custody actions, including the creation and timely filing of case plans by public children services agencies. Although LCCSB properly authored case plans for the Smith children while the appeal was pending, these plans were not filed or approved by either the Lucas or Ottawa County Juvenile Courts pursuant to S.B. No. 89.

On February 20, 1990, appellants filed a motion with the Ottawa County Juvenile Court seeking dismissal of the case because the time requirements of S.B. No. 89 were not met. In the alternative, appellants requested that they be granted leave to withdraw their admission of neglect and dependency entered at the 1988 adjudicatory hearing. Appellants' alternative motion to withdraw the admission was predicated on appellants' assertion that the admission of neglect was made on consideration that the dispositional phase of the case be transferred to Lucas County. Appellants contended that since the first appellate decision denied the court's ability to transfer the case there was a failure of consideration and that appellants should not be held to their part of the bargain. The trial court denied both the primary motion and its alternative.

The dispositional phase of the matter began on July 9, 1990, and concluded on July 20, 1990. Dozens of witnesses were called, and a transcript of nearly two thousand pages was created. A substantial amount of this hearing was devoted to the testimony of several psychologists who had treated the Smith children either in the past or present. Through the testimony of the psychologists came allegations from the children of multiple intrafamily sexual conduct. Appellant Vickie Smith was alleged to have had sexual relations with sons Richard and Forest. Appellant Ward Smith was alleged to have had sexual relations with his daughter Dawn. Richard Smith was alleged to have had sexual relations with all of his siblings. None of the Smith children testified, nor was counsel for appellants permitted to interview any of them.

At the close of testimony, the guardian *ad litem*, who also acted as attorney for the children, addressed the court with his recommendation for the children. The guardian prefaced his remarks to the court by saying that with the exception of Dawn it was the express desire of all the Smith children to return home. Reunification was not, however, the guardian's recommendation. In-

stead the guardian recommended to the court that it was in the best interests of the Smith children that permanent custody of Forest, Dawn, Maurice and Ronald Smith be granted to LCCSB. Richard, then nearing the age of emancipation, had already been returned to his parents' home. The guardian recommended that Ward eventually be returned to his parents' home because it was unlikely an adoptive home could be found for him.

Following the dispositional hearing the trial court terminated the Department of Human Services custody of Richard and granted custody to appellants. The court continued LCCSB's temporary custody of Ward Smith, Jr. LCCSB was granted permanent custody of Forest, Dawn, Maurice, and Ronald Smith. From this order appellants bring this appeal, citing the following assignments of error:

"I. The trial court committed reversible error in failing to dismiss the complaint requesting permanent custody of the Smith children in violation of § 2151.412 of the Ohio Rev.Code. This statute requires termination of temporary custody of public children service agencies which fail to comply with its requirements.

"II. The trial court committed reversible error by denying the minor Smith children their right to counsel in violation of Juv.R. 4(a) of the Ohio Rules of Juvenile Procedure and § 2151.28.1(h) of the Ohio Rev.Code. Such appointment was necessary due to a conflict which arose between the roles of the guardian ad litem and attorney representing the minor Smith children in the hearing for permanent custody.

"III. The trial court committed reversible error by failing to comply with the requirements of Juv.R. 29(D) of the Ohio Rules of Juvenile Procedure in taking the admission of the parents at the close of the adjudicatory hearing.

"IV. The court committed reversible error by failing to grant appellants' motion for mistrial by denying parents-appellants the opportunity to prepare and respond to highly prejudicial evidence at the dispositional hearing for permanent custody in violation of the due process clause of the Fourteenth Amendment to the United States Constitution and State law."

Also before the court is the motion of Ernest E. Cottrell, Jr., court-appointed guardian *ad litem* for the six Smith children, requesting leave to withdraw as guardian *ad litem.*

I

During the pendency of the first appeal of this case the Ohio legislature enacted S.B. No. 89, which, among other things, substantially changed R.C. Chapter 2151 relating to the obligations of public children services

agencies to prepare and submit to the appropriate juvenile court a case plan for each allegedly abused, neglected or dependent child in the agency's temporary custody. Section 7 of S.B. No. 89 provided transitional rules between the old law and the new:

"If a public children services agency * * * has temporary custody of a child on [January 1, 1989] and the child is not in the custody of one of his parents, his guardian, or his custodian on [that date], all of the following apply:

"(A) The agency shall do all of the following:

"(1) Prepare and file with the court a case plan for the child * * * on or before July 1, 1989, and * * * comply with all provisions of section 2151.412 of the Revised Code, as enacted by this act;

"(2) Conduct an administrative review of the child's case plan in accordance with section 2151.416 of the Revised Code * * * on or before the sixth month after the court conducts its first review hearing * * * and continue to conduct internal agency reviews of the child's case plan no later than every six months * * *.

"(B) The court with jurisdiction over the child shall conduct its first review hearing under division (C) of section 2151.417 of the Revised Code to review the child's case plan * * * on or before July 1, 1989, and shall continue to hold review hearings no later than every twelve months in accordance with division (C) of section 2151.417 of the Revised Code * * *.

"(C) The temporary custody order shall terminate on or before the earlier of January 1, 1990, or eighteen months after the last annual review was held or should have been held * * * under section 5103.151 of the Revised Code, as that section existed immediately prior to the effective date of this act." 142 Ohio Laws, Part I, 198, 263–264.

Appellants assert, and appellees LCCSB and the OCDHS do not deny, that case plans were not filed in accordance with S.B. No. 89. Appellants further contend that by authority of Section 7(C) of S.B. No. 89, if a case plan was not filed on or before January 1, 1990, the temporary custody order of the child involved terminated as a matter of law. Appellants made a similar argument relative to R.C. 2151.35(B)(1) and (2), which were enacted by S.B. No. 89.

A threshold question is whether S.B. No. 89 applies to this case at all. To answer this question we must determine first whether the legislature intended the statutes created by S.B. No. 89 to operate on cases initiated prior to its effective date, *Warren Cty. Bd. of Commrs. v. Lebanon* (1989), 43 Ohio St.3d 188, 190, 540 N.E.2d 242, 244, and, second, if the legislature did intend such retroactive application of the statutes, whether the statutes are permissibly remedial or impermissibly substantive amendments of the law. *Kilbreath v.*

*Rudy* (1968), 16 Ohio St.2d 70, 45 O.O.2d 370, 242 N.E.2d 658, at paragraph one of the syllabus; Section 28, Article II of the Ohio Constitution.

This court in its previous review of this case found that "[n]either R.C. 2151.28 nor 2151.35 were made expressly retrospective. Accordingly, * * * the statutes are to operate prospectively only, *i.e.*, to complaints filed on or after the effective date of January 1, 1989." *In re Smith* (July 10, 1989), Lucas App. No. L–89–112, unreported. We did not, however, specifically consider the phase-in rules set forth in Section 7 of S.B. No. 89.

Section 7 of S.B. No. 89 provides that "[i]f a public children services agency * * * has temporary custody of a child on * * * [January 1, 1989] and the child is not in the [physical] custody of one of his parents [then] * * * (C) [t]he temporary custody order shall terminate on or before * * * January 1, 1990 * * *." S.B. No. 89, Section 7, *supra*. By its language this section applies to any child in temporary custody of a public children services agency and not living with one of his parents on the effective date of the statute. Thus, it is the express intention of the legislature that this section apply to all children irrespective of whether the case had been filed prior to the effective date of the statute. Accordingly, we find that the legislature expressly intended retroactive application of Section 7.

Having determined that the legislature intended Section 7 of S.B. No. 89 to be applied retroactively, we must now turn to an analysis of whether the act's retroactive application is merely remedial in nature or whether it impermissibly impairs a substantial right. If the latter is true it would violate Section 28, Article II of the Constitution of Ohio, which prohibits *ex post facto* legislation.

"[I]t has been * * * held that a statute is substantive when it does any of the following: impairs or takes away vested rights * * *; affects an accrued substantive right * * *; imposes new or additional burdens, duties, obligations or liabilities as to a past transaction * * *; creates a new right out of an act which gave no right and imposed no obligation when it occurred * * *; creates a new right * * *; gives rise to or takes away the right to sue or defend actions at law * * *." (Citations omitted.) *Van Fossen v. Babcock & Wilcox, Co.* (1988), 36 Ohio St.3d 100, 107, 522 N.E.2d 489, 496.

Remedial laws are those affecting only the remedy provided. These include laws which merely substitute a new or more appropriate remedy for the enforcement of an existing right." (Footnotes omitted.) *Id.*

The question before us is whether a statute which forces a court to review and act upon its preexisting temporary custody order within a year or be forced to dissolve such an order is substantive or remedial.

It has been noted, " * * * the line between substantive and remedial may be difficult to ascertain in some cases * * *." *Van Fossen, supra* at 108, 522 N.E.2d at 497. In this instance, however, we can conceive of no more substantive matter than the determination of the custodian of a child. Under the statute in effect when the complaint in this matter was filed, a temporary custody order continued, subject to annual review by the juvenile judge. See former R.C. 5103.151, Sub.H.B. No. 428, 141 Ohio Laws, Part II, 3672, 4080–4081. Following the enactment of S.B. No. 89 any temporary custody terminates one year from the effective date of the statute. See Section 7, S.B. No. 89; cf. R.C. 2151.353(F). Accordingly, we find that Section 7 of S.B. No. 89 imposes additional encumbrances upon previously made judicial determinations and is, therefore, a retroactive law which affects a substantive right. As such, it is violative of Section 28, Article II of the Constitution of Ohio and may not be applied in the instant matter.[1] Therefore, appellant's first assignment of error is not well taken.

## II

Ernest E. Cottrell, Jr., a Genoa attorney, was appointed by the trial court to act as both guardian *ad litem* and attorney for the Smith children pursuant to Juv.R. 4(C). At the close of the dispositional hearing Cottrell addressed the court on two matters. First, he informed the court that with the exception of Dawn Smith, each of the Smith children wished to return to their parents' home. Second, Attorney Cottrell informed the court as guardian *ad litem* that although he believed that reunification of the family was possible, he recommended that permanent custody for Ronald, Maurice, Forest and Dawn be placed with the county. The guardian also recommended that Richard remain with appellants and that Ward eventually be returned to them.

Appellants assert that attorney Cottrell's recommendations exhibited a direct conflict between his dual roles as guardian *ad litem* and attorney for the Smith children. Appellants maintain that he should have petitioned the court to be dismissed as guardian *ad litem*. Further, appellants argue that when Cottrell failed to petition the court to be dismissed, the court erred by failing to recognize his conflict and remove him as guardian *ad litem sua sponte*. As authority appellant cites R.C. 2151.281(H) and *In re Baby Girl Baxter* (1985), 17 Ohio St.3d 229, 17 OBR 469, 479 N.E.2d 257.

---

**1.** It should be noted that LCCSB in this case did develop case plans and provide services pursuant to these plans for the Smith children. The apparent purpose of Section 7, which was to prevent the children from entering a state of administrative limbo during the transition to the new law, was substantially complied with.

Appellees respond that (1) appellants lack standing to raise the issue on appeal, (2) R.C. 2151.281(H) is inapplicable to this case, and (3) *In re Baby Girl Baxter* is distinguishable.

## A

■■ An appealing party may complain of an error committed against a nonappealing party when the error is prejudicial to the rights of the appellant. *State v. Ward* (Sept. 21, 1988), Summit App. No. 13462, unreported, 1988 WL 99182. In the case at bar the interests of appellant parents and at least five of the Smith children are aligned. All seek reunification of the family. Thus any error prejudicial to the children's interest in reunification is similarly prejudicial to the parents' interest. We find that the parents, appellants herein, have standing to raise the issue as an assignment of error. This is especially true in this instance where it is asserted that the minor children were denied proper legal counsel.

## B

R.C. 2151.281(H) provides:

" * * * If a person is serving as guardian ad litem and as counsel for a child and either that person or the court finds that a conflict may exist between the person's roles as guardian ad litem and as counsel, the court shall relieve the person of his duties as guardian ad litem * * * for the child * * *."

While the language of the statute is clear and mandatory, appellees are correct in their assertion that the statute is inapplicable to the case at bar. R.C. 2151.281(H) was enacted as part of S.B. No. 89 effective January 1, 1989. As previously discussed herein and in our decision in the first appeal of this matter, S.B. No. 89 does not apply retroactively to this case.

## C

■■ Notwithstanding the inapplicability of the statute, appellant argues that *In re Baby Girl Baxter, supra,* controls our decision with respect to this issue. In *Baxter* an attorney was appointed both as counsel and guardian *ad litem* for an apparently mentally incompetent mother of a baby who was the object of a termination of a parental rights action. At trial the mother's guardian/counsel elicited testimony from a social worker that his client had previously had a child out of wedlock. He elicited additional testimony from a psychologist that his client would have great difficulty caring for her child. At the close of the hearing the guardian referred to the "rather difficult position" he was in being both guardian *ad litem* and counsel for the mother.

The trial court terminated the mother's parental rights. The guardian *ad litem* /counsel filed a notice of appeal and withdrew. On appeal new counsel for the mother argued that the conflict between previous counsel's dual roles denied his client proper representation.

"The duty of a lawyer to his client and the duty of a guardian ad litem to his ward are not always identical and, in fact, may conflict. The role of guardian ad litem is to investigate the ward's situation and then to ask the court to do what the guardian feels is in the ward's best interest. The role of the attorney is to zealously represent his client within the bounds of the law. DR 7–101; DR 7–102.

"We have carefully reviewed the entire record in this case and based on that review find that [the attorney] was put in the position of being required to ask the court, as guardian ad litem, to do what he felt was in his ward's best interests and simultaneously being required to champion his client's cause in his capacity as her attorney. Since [the attorney] felt his ward-client's wishes were not beneficial to her, he was in an impossible situation. * * *

"Considering the foregoing, we hold that when an attorney is appointed to represent a person and is also appointed guardian ad litem for that person, his first and highest duty is to zealously represent his client within the bounds of the law and to champion his client's cause. If the attorney feels there is a conflict between his role as attorney and his role as guardian, he should petition the court for an order allowing him to withdraw as guardian. The court should not hesitate to grant such request.

"Thus, we find that [appellant] was denied proper representation of counsel during proceedings in the juvenile court." *In re Baby Girl Baxter, supra,* 17 Ohio St.3d at 232–233, 17 OBR at 471, 479 N.E.2d at 260.

Appellees would have us distinguish *In re Baby Girl Baxter* from the case at bar by pointing out that the *Baxter* court was able to show overt actions by the guardian/counsel which were detrimental to his client's wishes, whereas no such direct conflict has been shown in the instant matter. To accept appellees' position would be to require showing the commission of an act or acts by the guardian/counsel indicative of conflict. This would place an intolerable burden on the appellant in instances where a conflict manifests itself not in the commission of an act antithetical to the client's interests, but by the omission of an act or acts which might prove favorable to the client's wishes. We decline to require an appellant to, in effect, prove a negative. Accordingly, we find that the Smith children were denied proper counsel during their dispositional hearing, and appellants' second assignment of error is well taken.

Also before the court is a motion by Ernest E. Cottrell, Jr., the court-appointed guardian *ad litem*, to withdraw. We find the guardian *ad litem*'s motion well taken, if somewhat tardy, and grant it.

### III

Appellants' third assignment of error relates to the sufficiency of the colloquy concerning the admission of neglect that occurred at the adjudicatory hearing on July 17, 1988. The entire transcript of this colloquy was previously reproduced in the factual portion of this opinion. Appellants assert that the colloquy failed to comply with the requirements of Juv.R. 29(D).

Juv.R. 29(D) provides in part:

"The court * * * shall not accept an admission without addressing the party personally and determining that:

"(1) He is making the admission voluntarily with understanding of the nature of the allegations and the consequences of the admission; and

"(2) He understands that by entering his admission he is waiving his rights to challenge the witnesses and evidence against him, to remain silent and to introduce evidence at the adjudicatory hearing."

"In a case where parental rights are permanently terminated, it is of utmost importance that the parties fully understand their rights and that any waiver is made with full knowledge of those rights and the consequences which will follow." *Elmer v. Lucas Cty. Children Serv. Bd.* (1987), 36 Ohio App.3d 241, 245, 523 N.E.2d 540, 544. See, also, *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558.

In the case at bar, the court failed to address appellants personally; failed to determine the voluntariness of appellants' admission; failed to determine whether appellants understood the nature of the allegations against them;[2] and failed to determine whether appellants were aware of the consequences of their admission. Similarly, the court failed to advise appellants that by entering an admission they were waiving their rights to challenge witnesses and evidence against them, to introduce evidence at the adjudicatory hearing and to remain silent should they so choose. In short, the record shows no compliance with Juv.R. 29(D).[3]

---

2. There is some question as to whether even counsel fully understood the allegations. The attorney for OCDHS referred to an amendment of the complaint relating to the clothes dryer incident and trial counsel for the appellants referred to amending the complaint as it related to the chainsaw allegation.

3. Appellees assert that appellants waived defects in the adjudication by failing to raise the issue as a cross-appeal during the interlocutory appeal on the jurisdictional issue. Appel-

"The rights to conceive and to raise one's children have been deemed 'essential, * * * basic civil rights of man,' * * * and '[r]ights far more precious * * * than property rights.'" (Citations omitted.) *Stanley v. Illinois, supra* at 651, 92 S.Ct. at 1212, 31 L.Ed.2d at 558. A termination of parental rights is the family law equivalent of the death penalty in a criminal case. The parties to such an action must be afforded every procedural and substantive protection the law allows. In the case at bar, appellants were denied the procedural safeguards of Juv.R. 29(D). Appellants' admissions to the neglect and dependency of their children are, therefore, invalid.

Absent appellants' admissions, a juvenile court may make a finding of neglect and dependency only if from the evidence adduced it is clearly and convincingly shown that such neglect and dependency exists. Juv.R. 29(E)(4); *Elmer v. Lucas Cty. Children Serv. Bd., supra,* 36 Ohio App.3d at 244, 523 N.E.2d at 543. The judgment entry of August 18, 1988, makes no such finding based on evidence independent of appellants' admission. Accordingly, appellants' third assignment of error is well taken.

## IV

Appellants' fourth assignment of error consists of two arguments, both of which are related to the constitutional sufficiency of fundamental fairness as it relates to the proceedings held in the trial court.

## A

The first of these arguments suggests that because appellants' admissions at the adjudicatory hearing were invalid, the trial court lacked sufficient evidence to find by clear and convincing evidence that the Smith children were neglected and dependent. We have discussed this issue in our discourse on the previous assignment of error.

## B

■ The second prong of appellants' fourth assignment deals with the fundamental fairness of the proceedings in the dispositional hearing. Appellants complain specifically that the court allowed uncorroborated allegations of sexual conduct between the parents and the children through the hearsay

---

lants properly point out that, by implication, Juv.R. 34(E) provides for an appeal following the final order issued subsequent to the dispositional hearing. The adjudicatory phase and the dispositional phase are the parts of a single bifurcated procedure. The fact that this court found the jurisdictional question final and appealable does not mean that other alleged errors in the case were ripe for consideration at the same time as the jurisdictional question.

testimony of the children's therapists. Appellants further object that they and their attorney were denied the opportunity to cross-examine the children about these accusations or even to interview the children. Appellants concede that the constitutional right to confrontation exists only in criminal trials. However, they assert that the allowance of extensive hearsay and the denial of access to the parents' accusers violate the fundamental rules of fairness. *In re Burchfield* (1988), 51 Ohio App.3d 148, 154, 555 N.E.2d 325, 331.

Juv.R. 34(B) provides that at a dispositional hearing, the court may admit hearsay, opinion and documentary evidence that is material and relevant. Since the focus of the dispositional phase of a neglect or dependency matter is the future care and best interests of the child, R.C. 2151.353(A), then testimony relative to the child's home environment and parental care is material and relevant to the case. Thus, the trial court was within its discretion in allowing the submission of the evidence of which appellants' complain. Appellants' fourth assignment of error is not well taken.

On consideration whereof, the court finds that substantial justice has not been done the parties complaining, and the decision of the Court of Common Pleas of Ottawa County, Juvenile Division, is reversed. The motion of the guardian *ad litem* to withdraw is granted. This case is remanded to said court for further proceedings not inconsistent with this decision. It is ordered that appellee pay the court costs of this appeal.

*Judgment reversed*
*and cause remanded.*

GLASSER and MELVIN L. RESNICK, JJ., concur.