DECISION AND JUDGMENT ENTRY
{¶ 1} Appellants, Sally R. ("mother") and Richard C. ("father")[1]
(jointly "appellants"), appeal from a judgment of the Lucas County Court of Common Pleas, Juvenile Division, which terminated their parental rights to Sadie R. and granted permanent custody to appellee, Lucas County Children Services Board ("LCCSB"). For the reasons that follow, we affirm in part and reverse in part and remand for further proceedings consistent with this opinion.
 {¶ 2} Sadie R. was born October 28, 2003, and is appellants' second child. On November 3, 2003, LCCSB filed a Complaint in Dependency and Complaint for original permanent custody of Sadie and a motion for shelter care. An emergency shelter care hearing and a temporary custody hearing were held on the same day and LCCSB was granted temporary custody. Sadie was placed in relative care. LCCSB also filed a motion for a reasonable efforts bypass, which the trial court granted. This relieved LCCSB of the burden of making reasonable efforts to prevent the continued removal of Sadie from appellants. See R.C. 2151.419(A)(2)(e).
 {¶ 3} A staffing team decided to pursue permanent custody of Sadie R., and LCCSB filed an amended "Complaint in Dependency: Permanent Custody." Trial testimony revealed that because of LCCSB's prior involvement with appellants, LCCSB knew of the mother's physical and mental condition, and this formed the primary basis for the decision to pursue permanent custody.
 {¶ 4} Prior to the commencement of the adjudication and disposition proceedings, appointed counsel for the father requested leave to withdraw his representation due to lack of communication. In requesting leave to withdraw, appointed counsel stated that he had only met the father at one prior hearing. He stated, "[the father] has indicated his desires to me and at this point in time I am in no position to proceed competently to represent a man who has not presented himself to this court for trial." Counsel stated that he had written to the father and had received no reply. Sadie's guardian ad litem ("GAL") stated that the father had appeared at a pretrial and the bypass hearing, had made his wishes known, and thought that his counsel knew his wishes. The court granted the father's counsel leave to withdraw, based on lack of cooperation; the father's absence from trial; his failure to establish legal parentage; and "the fact that [counsel doesn't] know whether he's changed his mind from the last time he's talked to [counsel]."
 {¶ 5} The following testimony was given at adjudication. Tasha Jones, an assessment caseworker with LCCSB, testified that she had received a referral from the hospital because there were concerns that the mother had previously had a child removed and that she was unable to care for Sadie. Jones testified that she spoke with the mother at the hospital the day after Sadie was born, and characterized her demeanor as "resistant." Jones performed a risk assessment, asking the mother questions about history, current status, and her knowledge of parenting skills. Using the risk assessment test, Jones classified the risk to Sadie as "high" if she remained in the mother's care. Jones testified that the mother has a prior history of not completing offered parenting classes and services with respect to her first child. Although the mother had taken interactive, hands-on parenting classes for almost a year and a half, she could not demonstrate an ability to retain knowledge of necessary parenting skills. This contributed greatly to the involuntary termination of the mother's parental rights to her first child.
 {¶ 6} Two exhibits were then introduced into evidence by LCCSB: the appellate decision regarding the adjudication and disposition of the mother's first child and a copy of the judgment entry awarding permanent custody of the mother's first child to LCCSB. The documents were admitted into evidence over the mother's objection for lack of relevancy to the mother's current condition.
 {¶ 7} The mother then testified on her own behalf. She testified that most of her previous problems that caused the removal of her first child were due to her involvement with the child's father, who is also Sadie's father. She testified that she is no longer in a relationship with the father and that she has had no in-person contact with him for about seven months. She maintains her own apartment, and receives services through the Lucas County Board of Mental Retardation ("MRDD"). She asserted that she is able to take care of her own needs, but she does rely on MRDD workers for daily living needs and advice. In her opinion, the father's absence renders her living conditions more stable. She is unemployed but receives enough money through SSI to pay for her needs. She is on the waiting list to be employed at Lott Industries. She graduated from Penta County in 2001, and during her four years at Penta she interned in a day care. She testified that she wants to parent Sadie and that, in her opinion, she is able and capable of parenting. While she was pregnant with Sadie, she voluntarily enrolled in and completed a parenting class through the Help Me Grow program at Connecting Point, and voluntarily uses other agency services. As to her first child, the mother testified that the father was mostly to blame for the conditions that caused his removal.
 {¶ 8} The GAL appointed for Sadie questioned the mother regarding parenting skills. She was able to answer all the questions the GAL asked.
 {¶ 9} Ryan Parker, a LCCSB caseworker, testified that he had made one visit to the mother's home at 2:00 p.m., and that she had just woken from a nap. LCCSB asked no other questions of Parker.
 {¶ 10} The court formally found Sadie to be a dependent child. The matter proceeded immediately to disposition without objection. Ryan Parker again testified that he was the mother's LCCSB caseworker since November 2003. After the decision was made to pursue original permanent custody, the case plan determined adoption of Sadie as the ultimate goal. Parker testified that Sadie was doing well in her current relative placement. Although he was aware that the mother exercised her visitation rights every week, he acknowledged that he had never seen her interact with Sadie. He described the mother's home as "maintained" and reported no problems with it. His opinion that the mother had not developed necessary parenting skills was derived from discussions with her MRDD caseworkers and his knowledge of her case history.
 {¶ 11} Terry Strickland, a case manager for MRDD, testified that she had been the mother's caseworker during the disposition of her first child, and that her opinion at that time was that she would be unable to parent without constant support and supervision. She testified that although the mother tried very hard to parent her first child, she was not able to develop necessary parenting skills. The child was significantly developmentally delayed when he was removed from her care. She further testified that although the mother was currently availing herself of extensive supports and services, these same services were in place during the disposition of her first child. Her ultimate opinion was that because of the mother's low IQ and lack of family support system, she would always be dependent on agency services for day-to-day needs and could not independently parent Sadie.
 {¶ 12} Amy C., a cousin to the mother by marriage, is the current relative care placement for Sadie, and has almost completed the process of adopting Sadie's brother. Amy C. was present during each of the mother's visitations with Sadie. She noted that the mother required the same prompting and instructions in caring for Sadie during each visit, and that the mother would ask the same questions about what to do to care for Sadie. She expressed concern that the mother had not shown independent knowledge of how to carry out basic parenting tasks.
 {¶ 13} Jason Bachar, a counselor at Harbor Behavioral Health Care, testified that he had been providing group therapy and individual counseling with the mother for six months. He testified that she is moderately depressed and has high anxiety. She currently takes medications in conjunction with therapy. He noted that she had a history of anxiety, and he opined that she would likely require medication to control her emotional states for the foreseeable future. He also noted that the mother expresses a sincere, firm desire to keep custody of Sadie, but that she relies heavily on service providers for support and advice. He described an event during which the mother had a grand mal seizure and had to be hospitalized. She has a medical history of seizures and had been diagnosed with seizure disorder. She is currently taking medication to control the seizures.
 {¶ 14} Mary Haines, a clinical neuropsychologist, gave the mother a neuropsychological examination in March 2003, the spring before Sadie was born. She administered tests for measuring attention, memory, emotional functioning and IQ. The mother's full scale IQ is 67, falling in the range of mildly mentally retarded, a borderline category. She had high visual perception scores, and she learns best through observing other people do things. Her auditory attention and memory, however, were in the low ranges. Her responses to emotional testing indicated moderate to severe depressed mood and moderate anxiety. The mother's social judgment was found to be severely impaired and her oral vocabulary profoundly impaired. Academic functioning tests revealed that the mother reads at less than a first grade level. Haines' opined, however, that her test results did not necessarily indicate that the mother is incapable of parenting in the future, but she did not state an opinion as to whether she could currently parent an infant. At the end of Haines' testimony, her complete report and the mother's previous medical records were introduced and received into evidence.
 {¶ 15} Heather Haynes, the mother's MRDD caseworker, testified that she had been helping her develop life skills and work skills since August 2003, when she was pregnant with Sadie. Haynes makes sure that the mother keeps doctor's appointments and helps with any other necessary transportation. In January 2003, Haynes provided the mother with a computerized infant that she had to care for four days by herself, in order to simulate taking care of a real baby. The computerized infant recorded when it was changed, fed, rocked, and how often and how long it cried. Haynes reported that the computerized numbers "[weren't] very good," but she nonetheless opined that the mother had done a fairly good job at parenting the computerized baby.
 {¶ 16} Haynes provided transportation to and observed the mother during her visitations with Sadie. She testified that, at visitation, she needed prompts and reminders of how to care for Sadie. In Haynes opinion, the mother was gradually improving, but she would presently be unable to parent Sadie without more extensive support. Haynes asserted that adequate supports were available through MRDD parenting counselors, who provide one-on-one parenting help.
 {¶ 17} A Connecting Point home visitor and service coordinator, Bernetta Boyd, testified to her experience with the mother. She testified that the mother contacted her voluntarily to enroll in parenting classes while she was pregnant with Sadie. She also testified that the mother could better improve her parenting skills by participating in a hands-on, interactive parenting class. She stated that the mother's living environment and anxiety level have greatly improved since she stopped having contact with Sadie's putative father. She could not determine whether the mother would be able to carry out skills learned in parenting classes, since the classes were not hands-on, interactive classes. She opined that although the mother was currently unable to independently parent, with adequate supports she could parent Sadie in the foreseeable future.
 {¶ 18} At the end of testimony, the court granted permanent custody of Sadie to LCCSB for adoptive planning and placement. In its findings of fact, the court found that LCCSB was not required to make reasonable efforts to prevent the need to remove Sadie from the mother's home due to its previous efforts with respect to the mother's first child and that child's removal. The mother was previously provided with extensive services and parenting classes in order to prevent the removal of her first child, but she showed no ability to learn necessary parenting skills. Additionally, the court found that the mother's "chronic mental retardation [and] chronic mental illness is so severe that it makes her unable to provide an adequate permanent home for the child at the present time, and as anticipated, within one year * * *." With respect to the father, the court found that he had also had his parental rights of Sadie's sibling previously involuntarily terminated; that he had abandoned Sadie; and had willfully failed to provide her with support when financially able to do so.
 {¶ 19} From that judgment, appellants appeal and set forth the following assignment of error:
 {¶ 20} "The trial court erred in granting Lucas County Children Services Board's motion for permanent custody as it was against the manifest weight of the evidence to grant it."
 {¶ 21} "[T]he right to raise a child is an `essential' and `basic' civil right." In re Murray (1990), 52 Ohio St.3d 155, 157, quotingStanley v. Illinois (1972), 405 U.S. 645. A parent's interest in the care, custody and management of his or her child is "fundamental." Id.;Santosky v. Kramer (1982), 455 U.S. 745, 753. The permanent termination of a parent's rights has been described as, "* * * the family law equivalent to the death penalty in a criminal case." In re Smith (1991),77 Ohio App.3d 1, 16. Therefore, parents "must be afforded every procedural and substantive protection the law allows." Id.
 {¶ 22} Ohio courts have long held that a parent who is a suitable person has a paramount right to the custody of his or her child. Clark v.Bayer (1877), 32 Ohio St. 299, 310; In re Murray (1990), 52 Ohio St.3d 155,157. For this reason, a court, "* * * may not award custody to [a] nonparent without first making a finding of parental unsuitability * * *." In re Perales (1977), 52 Ohio St.2d 89, syllabus. Such a requirement still exists, but is now statutorily defined.
 {¶ 23} R.C. 2151.414 provides that a parent's rights may not be terminated unless the court finds evidence that (1) the child, "* * * cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent," and (2) that a grant of permanent custody of a child to a children's service agency is in the child's best interests. R.C. 2151.414(B). With respect to the first requirement, R.C. 2151.414(E) sets forth a list of 16 predicate findings. One of those findings must be established prior to a judicial conclusion that a child cannot or should not be placed with the child's parent. R.C. 2151.414(E). The statute also enumerates certain criteria for evaluating whether permanent custody with a children's services agency is in the child's best interests. R.C. 2151.414(D)(1) through (4).
 {¶ 24} All of the court's findings must be supported by clear and convincing evidence, R.C. 2151.414(B), and will not be overturned as against the manifest weight of the evidence if the record contains competent credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established. In re S et al.
(1995), 102 Ohio App.3d 338, 344-345; Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus. Additionally, "[e]very reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 80.
 {¶ 25} In this matter, the court found that R.C. 2151.414(E)(2) and (11) were proven with respect to the mother and that therefore, Sadie cannot and should not be returned to the mother's care. The court also determined that it was in Sadie's best interest to grant the motion for permanent custody. The statutory provisions state in material part:
 {¶ 26} "(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *.
 {¶ 27} "* * *.
 {¶ 28} "(11) The parent has had parental rights involuntarily terminated * * * with respect to a sibling of the child." R.C. 2151.414(E)(2) and (11).
 {¶ 29} The trial court had clear and convincing evidence that the statutory conditions were met. As to R.C. 2151.414(E)(2), several caseworkers and support agency staff testified to the lengthy aid that the mother was given in order to help her develop parenting skills. No one disputed that she did not try to gain necessary parenting skills. No one disputed that the mother, due to her physical and mental condition, would most likely be unable to gain necessary parenting skills within a reasonable amount of time. Further, the mother's physical and mental condition was corroborated by a neuropsychologist who testified that her condition was chronic and not likely to change. Although the neuropsychologist did not state an opinion as to whether the mother would be able to gain necessary parenting skills, she did testify that the mother's mental and physical condition is chronic; that her academic functioning is equivalent to that of a first grader; and that her working memory and auditory memory make it difficult for her to remember and learn verbal directions. Specifically, she has great difficulty in carrying out verbal instructions of more than one to two steps. Additionally, there is evidence from LCCSB's previous case planning and parenting classes that the mother was unable to learn basic, necessary parenting skills and ample testimony was offered to show that she had since made no more progress.
 {¶ 30} Appellee argues that the mother's chronic mental conditions present both a current risk to Sadie and a great likelihood that the risk will continue into the future. Further, clear and convincing evidence shows the mother's inability to presently or within a year provide a permanent home for Sadie. The mother argues in response that ample testimony suggests that she could apply the skills she learned to parent Sadie if she was given more of a chance to interact and visit with Sadie. However, every witness at trial expressed a similar concern: the mother cannot parent without constant supervision and help from other adults. With one exception, all witnesses expressed strong doubts that the mother would be able to adequately parent within the foreseeable future.
 {¶ 31} The trial court found that clear and convincing evidence was presented to meet the condition of R.C. 2151.414(E)(2). As to the condition of R.C. 2151.414(E)(11), no one disputes that the mother has had her parental rights involuntarily terminated with respect to Sadie's sibling. Thus, the court had to conclude that Sadie cannot or should not be placed with her mother within a reasonable amount of time. R.C. 2151.414. Weighing the evidence and testimony such as to make every reasonable inference in favor of upholding the trial court's findings of fact, the trial court did not err in finding that the conditions of R.C. 2151.414(E)(2) and (11) were met.
 {¶ 32} The trial court also found that it was in Sadie's best interest to grant appellee's motion for permanent custody. Both the LCCSB caseworker and the GAL recommended that a permanent custody award was in Sadie's best interest. The trial court also found that Sadie's need for a legally secure placement cannot be achieved without a grant of permanent custody. Since her birth, Sadie has been in the same relative care as her older sibling. The relative has almost completed the adoption process for the older sibling and expressed a wish to adopt Sadie as well. This meets the statutory consideration of Sadie's best interests pursuant to R.C. 2151.414(D)(1) and (4). Additionally, R.C. 2151.414(D)(5) weighs in favor of a grant of permanent custody since the statutory factor of R.C. 2141.414(E)(11), the involuntary termination of appellant's parental rights with respect to Sadie's sibling, was met.
 {¶ 33} After thoroughly reviewing the record in this case, and resolving all inferences in favor of upholding the trial court's decision, we conclude that the trial court's decision is not against the manifest weight of the evidence with respect to the termination of the mother's parental rights. The sole assignment of error is not welltaken with respect to the mother.
 {¶ 34} As for the father, his counsel was permitted to withdraw his representation. Pursuant to Juv. R. 4(A) and our decisions in In re AlyssaNicole C. (2003), 153 Ohio App.3d 10 and In re Savannah M. (2003), 6th Dist. No. L-03-1112, 2003-Ohio-5855, Singer, J., concurring, we review the trial court's decision to allow the father's counsel leave to withdraw for plain error. The plain error doctrine permits an appellate court to notice errors not brought to the attention of the court by way of an assignment of error. In re Solis (1997), 124 Ohio App.3d 547,550; App. R. 12(A).
 {¶ 35} In In re Alyssa, we followed In re M.L.R. (2002),150 Ohio App.3d 39, to conclude that a trial court commits plain error by permitting a parent's counsel in a termination case leave to withdraw without first ascertaining whether the client "by other conduct renders it unreasonably difficult for the lawyer to carry out his employment effectively." 153 Ohio App.3d at 20, citing In re M.L.R. and DR 2-110(C)(1)(d). Because termination of a parent's rights is the most serious of proceedings, 2003-Ohio-5855 at ¶ 42, parents "must be afforded every procedural and substantive protection the law allows." Inre Smith (1991), 77 Ohio App. 3d 1, 16.
 {¶ 36} Therefore, to adequately protect a parent's right to counsel, Juv. R. 4, and avoid plain error, the trial court must, at minimum, make two inquiries. First, the court must "ascertain that counsel's attempts to communicate with and obtain the cooperation of the client were reasonable." In re Savannah at ¶ 45. Second, the court must verify that "the failure of this communication resulted in the inability of counsel to ascertain the client's wishes." Id.
 {¶ 37} Here, the trial court failed to observe this rule. These circumstances parallel those of In re M.L.R. at ¶ 21-22, which found prejudice where counsel was allowed to withdraw on the day of the dispositional hearing, in the client's absence, without prior motion or notice to the client, and without a demonstration to the court that the client's inaction rendered it unreasonably difficult for the attorney to represent him. In addition, this father's counsel did state that the father had "indicated his desires" to him, but neither counsel nor the court elaborated or inquired as to what those desires were. This circumstance is in contrast to the permissible withdrawal in In reSavannah, where counsel elaborated upon the attempted yet failed communications and stated that she was unable to determine what the client's wishes were. See also In re Isaac M., Sarina M., and Karisa J.,
6th Dist No. L-03-1097, 2003-Ohio-6197 (counsel's withdraw proper). Plain error occurred because the father was denied his right to representation at the dispositional hearing.
 {¶ 38} This conclusion is consistent with our previous holding in Inre Keith Lee P., et al. 6th Dist. No. L-03-1266, 2004-Ohio-1976. In that case, we upheld a termination of parental rights where the trial court allowed counsel for the parent to withdraw without the parent present. However, that counsel stated that he communicated with the parent regarding the dispositional hearing, and the parent told the attorney that she would attend. On appeal, the parent argued a lack of service and notice. We resolved that issue pursuant to Juv. R. 16(A) and Juv. R. 20(A) and (B). In comparison, the error which occurred here, improperly allowing an attorney to withdraw, is equivalent to a denial of counsel in violation of Juv. R. 4(A). Therefore, our resolution of this improper withdrawal issue rests solely upon the application of Juv. R. 4(A) and our decisions in In re Alyssa Nicole C. and In re Savannah M.
 {¶ 39} On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed as to the termination of Sally R.'s parental rights. The same judgment is reversed and vacated as to the termination of Richard C.'s parental rights. The prior temporary order with respect to Richard C.'s rights is reinstated. This matter is remanded for further proceedings consistent with this decision. Costs to appellee pursuant to App. R. 24.
JUDGMENT AFFIRMED, IN PART, AND REVERSED, IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4, amended 1/1/98.
Handwork, J., Pietrykowski, J., concur.
Singer, P.J., concurs and writes separately.
[1] The record indicates that Richard C. had not yet established legal paternity of Sadie; however, the trial court's judgment terminated any parental rights he may have as well, and he is a party to this appeal.