DECISION AND JOURNAL ENTRY
Appellants Christina Wilson and James Christian appeal the decision of the Summit County Court of Common Pleas, Juvenile Division, which terminated their parental rights and gave permanent custody of their daughters, Rebecca and Brittany Christian, to Summit County Children Services Board. We affirm.
 I.
On February 9, 1996 Summit County Children Services Board ("CSB") filed a complaint in juvenile court, alleging that Rebecca and Brittany were neglected and dependent children, as defined by R.C. 2151.03 and 2151.04 respectively. For the second time in a week CSB found the young children unclothed except for dirty diapers. The home was filthy and the bedding inadequate.[1]
CSB had removed the girls from the home pursuant to Juv.R. 6 on February 8. The juvenile court granted emergency temporary custody to the agency on February 13 and a case plan was developed by CSB. On March 18 the court found by clear and convincing evidence that the children were neglected and dependent, pursuant to R.C. 2151.03(A)(2) and 2151.04(C). On April 2, the court granted CSB protective supervision, and the girls were returned to Christina's care. The protective supervision order was predicated on Christina's agreement to move into her mother's home, which was a clean and appropriate residence for the children. The case plan was revised with the goal of reuniting the children with their parents.
On May 21, the children were again removed from their mother's care when Rebecca, age 2, was found wandering the neighborhood unattended for over forty-five minutes. Christina and her daughters had moved out of Christina's mother's house and back to their prior residence, contrary to the conditions imposed by the protective supervision plan. Both Rebecca and Brittany were filthy and malodorous. CSB workers found dog feces throughout the house. The children's room and bedding were filthy, stained with feces and urine. Rebecca engaged in head-banging, throwing herself into walls, and biting her sister. The court again granted CSB temporary custody and the agency began providing psychological and supportive services for the children and their parents. After hearings on June 17 and July 23, the court granted temporary custody to CSB and approved an amended case plan.
As part of the case plan, both parents were to attend parenting classes and to participate in supervised visitation through CSB. Christina was directed to undertake counseling and to find appropriate housing for herself and her children.[2] Neither parent made much effort to comply with the case plan. Christina attended the supervised visitation, but her parenting skills were very limited. The visitations were frequently marked by acting out behavior by the children, either encouraged by their mother or rewarded approvingly by her after the fact. James attended the visitation sessions infrequently and his interaction with the children was minimal to non-existent. James did not attend parenting classes. Christina did not begin to attend parenting classes for at least six months after the children were removed for the second time.
CSB then filed for permanent custody on January 6, 1997, pursuant to R.C. 2151.413. By this time it was clear that neither parent had put much effort into complying with the case plan for reunification. Christina had just begun to attend parenting classes and had made no improvement in her parenting skills or in the physical conditions of her house. Rebecca's treating psychologist had concluded that she was an extremely difficult child who needed a very structured environment to overcome the years of neglect she had experienced by age three. Brittany, who was a year younger, seemed to have adapted better than her older sister did, but when the girls were together, Rebecca became aggressive toward Brittany. James remained essentially uninvolved. The court decided to terminate the supervised visitation, because the children became visibly upset and exhibited inappropriate behavior following each visit.
The magistrate held three hearings on the motion for permanent custody, pursuant to R.C. 2151.414. The first two hearings on February 25 and May 9 were held in the magistrate's office because no courtroom was available. Halfway through the third hearing, the proceeding had to be continued from one courtroom to another due to a scheduling conflict. On June 13, the magistrate issued her decision, recommending that parental rights be terminated and that CSB be granted permanent custody. Christina filed objections to the magistrate's decision. Later James asked the court to be allowed to join in Christina's objections because "the issues of importance are the same for both mother and father." The court granted this motion.
On July 7, 1998, the trial court overruled the objections to the magistrate's decision and adopted the decision, terminating parental rights and responsibilities and granting permanent custody to CSB. Both James and Christina now appeal this decision. Christina asserts as error that (1) the courtroom facilities were so inadequate that she was denied meaningful access to the court in violation of her due process rights, and (2) the trial court erred in allowing the testimony of psychologist Dr. Lord because Dr. Lord was biased and had an unethical conflict of interest in the case. James asserts as error that there was not clear and convincing evidence to warrant the termination of his parental rights. We will address these errors in turn.
 II.
Appellant Christina Wilson's First Assignment of Error:
 MOTHER WAS DEPRIVED OF MEANINGFUL ACCESS TO THE COURTS (sic) AND ITS JUDICIAL PROCESS WHEN THE JUVENILE COURT HEARINGS WERE HELD IN AN OFFICE AND NOT IN A COURTROOM IN VIOLATION OF HER DUE PROCESS RIGHTS.[3]
In the instant case, three magistrate's hearings were held. Due to lack of an available courtroom the first two hearings were held entirely in the magistrate's office, a room approximately ten feet by ten feet in size. At the first hearing, Christina's counsel repeatedly objected to the inadequacy of the facilities to accommodate the presence of eight participants in addition to a witness. Christina's counsel complained about lack of a table for organizing her materials and for taking notes. The magistrate provided her with an extra chair to be used as a "table" to organize her documents. The magistrate acknowledged the difficulties presented by the limited facilities but observed that the over-utilization of space was a chronic problem. Finding that nothing would be achieved by postponing the hearing, the magistrate denied Christina's request for a continuance. The second hearing was also held in the magistrate's office and Christina again objected to the facilities. The third hearing took place in a courtroom, until the room had to be vacated for another proceeding, at which time the hearing was continued in the magistrate's courtroom.
Christina cites Appendix D to the Supreme Court Rules of Superintendence (formerly M.C.Sup.R. 17) which governs court facilities. Christina asserts that the magistrate's office lacked tables for counsel and sufficient size for consultation between counsel and client, in violation of the rules. She states that because these provisions were lacking, she was denied meaningful access to the court, in violation of her due process rights. It is abundantly clear from the record that the magistrate and the judge were well aware of the limited court facilities. The trial court addressed the problem at some length in the judgment entry.
"The standards set forth in the rules should be taken into consideration when measuring the adequacy of existing court facilities[.]" Taylor 2 Ohio St.3d at 18. However, we have noted that "[t]he Rules [of Superintendence] do not give any rights to individual [parties]." Esber v. Esber (1989), 63 Ohio App.3d 394,397 (superseded by statute on other grounds).
It is well established that in a proceeding to terminate parental rights "[t]he parties are afforded every procedural and substantive protection allowed by law because the termination of parental rights is the family law equivalent of the death penalty in a criminal case." In re Hitchcock (1996), 120 Ohio App.3d 88,101, appeal dismissed as improvidently granted (1998), 81 Ohio St.3d 1222, citing In re Smith (1991), 77 Ohio App.3d 1, 16. Due process in civil cases requires, at a minimum, notice and a right to be heard. Ohio Valley Radiology Assoc. Inc. v. Ohio Valley Hosp. Assn. (1986), 28 Ohio St.3d 118, 124-125. Ohio courts have used the balancing test established in Mathews v. Eldridge (1976),424 U.S. 319, 335, 47 L.Ed.2d 18, 33, to determine parental due process rights in custody termination proceedings. See, e.g., In re Harding (Jan. 25, 1995), Summit App. No. 16552, unreported.
Mathews proposed a three-factor analysis, involving (1) the private interest affected, (2) the risk of erroneous deprivation and the probable value of additional safeguards, and (3) the governmental burden of additional procedural requirements. Mathews, 424 U.S. at 335, 47 L.Ed.2d at 33. In the instant case, although the private interest affected is great, the governmental burden — either to build additional court facilities or to forego the resolution of custody determinations — is also great. The remaining factor, that an erroneous deprivation will result from a failure to provide additional safeguards, is minimal in this case.
Christina claims that the facilities created difficulties because she was not able to confer privately with her counsel, in that other participants in the small office used for the hearing could overhear a whispered conversation. However, it is apparent from the transcript that Christina's counsel did not request a break for purposes of a private consultation. Rather, counsel repeatedly requested a continuance until such time as a courtroom was available. The magistrate denied her requests for a continuance at the first and second hearing, finding that the limits on courtroom space due to very tight scheduling was not likely to change.
The decision whether to grant a motion for a continuance rests within the sound discretion of the trial court. Sayre v. Hoelzle-Sayre (1994), 100 Ohio App.3d 203, 208. A reviewing court will not disturb the trial court's decision absent an abuse of discretion. Id. An abuse of discretion connotes more than an error of law or judgment and implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. We find that it was not an abuse of discretion for the magistrate to decide not to grant a futile continuance when Christina could have availed herself of a less drastic and more immediate remedy.
Christina also points to a problem that arose at the third hearing when the proceeding was continued from a larger courtroom to a smaller courtroom. One witness discussed the process of discovery in the case with another witness during the break, which occurred halfway through the testimony of the first witness. The first witness then related the occurrence and the contents of the conversation when she returned to the witness stand. Her testimony, based on this inappropriate conversation, was hearsay. First, we note that this occurrence has nothing to do with the error Christina has assigned. The fact that this unfortunate conversation took place while the proceeding was being continued to another courtroom is purely coincidental. Such a conversation could have taken place during a brief recess in any proceeding.
Furthermore, Christina did not object to the testimony either on the basis that it was hearsay or because it was contaminated by discussion with the other witness. Thus, Christina did not preserve this issue for appeal. Where a party fails to object to the admission of evidence "any error in the admission of such evidence [is] waived for appellate purposes." Chaney v. Beard-Chaney (July 16, 1998), Cuyahoga App. No. 73009, unreported, citing First Fed. S. L. Assn. of Akron v. Cheton Rabe (1989),57 Ohio App.3d 137, 144. Unless the error is plain error, seriously affecting the basic fairness of the judicial process, such error will not be reversed on appeal. See Chaney, supra, citing Goldfuss v. Davidson (1997), 79 Ohio St.3d 116, syllabus. We do not find that the admission of the testimony amounted to plain error. Thus, we overrule Christina's first assignment of error.
 III.
Christina's Second Assignment of Error:
 IT WAS PREJUDICIAL ERROR FOR THE COURT TO ALLOW DR. LORD TO TESTIFY TO HER OPINION THAT PARENTAL RIGHTS BE TERMINATED WHEN SHE TESTIFIED BOTH AS A LAY WITNESS WHO OBSERVED THE CHILDREN COME INTO CSB'S CARE WHILE IN HER CAPACITY AS A CONSULTANT FOR CSB WHILE ON CSB'S PROPERTY AND ALSO AS A PRIVATE CONSULTANT WHO SAW THE CHILDREN AS A PSYCHOLOGIST ON A PRIVATE REFERRAL FROM CSB IN DERELICTION OF HER ETHICAL DUTIES TO AVOID CONFLICT OF INTEREST.
 Christina objects to Dr. Lord's testimony on the basis that Dr. Lord was biased and that her employment by CSB evidenced a conflict of interest.
First, we must note that, contrary to the assertion in this assignment of error, Dr. Lord did not testify as to whether parental rights should be terminated. She was asked several times about this issue, and she testified that this was beyond the purview of her knowledge about this case. Dr. Lord made it very clear that she diagnosed and treated the children, and had no knowledge about the parents' ability to care for these children, either before or after intervention by CSB and the court.
The bias claim is based on the fact that Dr. Lord, who works as a consultant at CSB, happened to be at the agency when Brittany and Rebecca were brought to the agency on May 21, 1996. Dr. Lord testified that she was present when staff tried to bathe the girls, who were filthy and malodorous. Dr. Lord did testify that she had never seen children so filthy in her many years of treating neglected and abused children. However, when asked how the incident at CSB affected her treatment of the girls, Dr. Lord testified:
 The treatment was more of the behavioral problems, the disabilities that I noted. As I said, Rebecca, you couldn't redirect her at the time, she wouldn't follow instructions.
 I was concerned about the receptive language skills, did she understand, did she have a clear sense of what was asked of her, so then I saw her at my office.
The balance of Dr. Lord's testimony was similar in content. It was her professional opinion that both girls, but especially Rebecca, needed a very structured environment, with consistent reinforcement of the desired behaviors. Dr. Lord testified that the symptoms exhibited by Rebecca, which included head-banging and inappropriate social interaction, were typical of a child who had been severely neglected. It is clear from her testimony that, despite her observation of the children when they first appeared at CSB in May, her diagnosis and treatment of the children were based on testing, her observation of their behavior in her presence, and their progress over time. There is no evidence from the record to support a claim of bias. In fact, Dr. Lord repeatedly refused to testify as to whether she believed parental rights should be terminated. When asked about this, she replied:
I don't know these parents. I've never been to their home.
I can't say [the children] were taken right out of that home.
 Whoever took them would have to address that. I can't. Only what I saw, what I feel they need, and my concerns based on my observations.
It is clear from the record that Dr. Lord demonstrated no bias based on her initial impression of the girls when she first saw them at CSB.
Christina's second concern is that Dr. Lord works both as a consultant for CSB at the agency's office and as a private practitioner, treating clients referred to her from CSB, as was the case with Brittany and Rebecca. Christina asserts that this was a conflict of interest, in the nature of a dual relationship, in violation of the ethical rules of the American Psychological Association. These rules of professional conduct are applicable to psychologists licensed to practice in the State of Ohio, through the Ohio Adm. Code 4732-17. The administrative code prohibits "multiple relationships" with a client, namely, the entering into a
 personal, scientific, professional, or other relationship with [a client] if it appears likely that such a relationship reasonably might impair the psychologist's * * * objectivity or otherwise interfere with the psychologist * * * effectively performing his/her functions as a psychologist * * * or might harm or exploit the [client].
Ohio Adm. Code 4732-17(E)(2)(a). See, also, Ethical Principles of Psychologists and Code of Conduct, Ethical Standard 1.17. No such dual relationship existed between Dr. Lord and her young clients.
Christina objects to the conflict of interest which allegedly existed because Dr. Lord did consulting work for CSB and also provided services for CSB clients via referrals from the agency. The administrative code states that "[w]hen there is a conflict of interest between the client and a psychologist's * * * employing institution, the psychologist * * * shall clarify the nature and direction of his/her loyalties and responsibilities and keep all parties concerned informed of his/her commitments." Ohio Adm. Code 4732-17(C)(1). See, also, Ethical Principles of Psychologists and Code of Conduct, Ethical Standard 1.21.
Chapter 5153 of the Ohio Revised Code authorizes public children services agencies to "provide such care as the public children services agency considers to be in the best interest of any child adjudicated to be an abused, neglected, or dependent child the agency feels to be in need of public care or service[.]" R.C. 5153.16(A)(4). Such agencies are further authorized to contract with any private or government service provider for services authorized by the agency's rules. R.C.5153.16(C)(2)(a)(v).
Dr. Lord testified as to the nature of her consultation work for CSB. Essentially, her duties at CSB consisted of "diagnostic services as well as case plan reviews[.]" Her consultation at CSB included "testing of children when they come into care, typically to take a look at what their needs are so that they know what kind of services to request[.]" There is no evidence that there existed any conflict between the interests of Brittany and Rebecca in receiving appropriate diagnosis and treatment from Dr. Lord and the interest of CSB in having its clients appropriately diagnosed and treated, whether by staff or by private practitioners pursuant to referral. Like the caseworkers from CSB who implement the case plans for children under the care of CSB, Dr. Lord was mandated to work to achieve the best interests of the children, whether as a consultant to CSB or as a private psychologist working by referral for CSB clients. Clearly Dr. Lord's services to CSB and its clients, as a consultant and as a private therapist, fell within the purview of services authorized by R.C. 5153.16.
Christina has pointed to nothing in the record to support her contention that Dr. Lord's employment implicated a conflict of interest. Nor has Christina pointed to any law supporting this assignment of error.
Her assignment of error is overruled.
 IV.
James' Assignment of Error:
 THE TRIAL COURT ERRED IN TERMINATING THE PARENTAL RIGHTS OF APPELLANT/FATHER JAMES CHRISTIAN, UPON INSUFFICIENT EVIDENCE TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THAT THE CHILDREN COULD NOT BE PLACED WITH HIM IN A REASONABLE TIME.
As a preliminary matter, we note that James did not properly preserve this issue for appeal. He did not file a specific objection to the magistrate's decision as to the weight of the evidence supporting the termination of his parental rights, as required by Civ.R. 53(E)(3)(b). He merely joined in Christina's objections which dealt in pertinent part with the evidence of her ability to perform as a custodial parent. However, in the interests of justice, we will address the merits of his assignment of error.
In the matter of the termination of parental rights and responsibilities in a situation where the child has not been abandoned or orphaned, this Court has written,
 [i]n determining whether to terminate parental rights in a natural child who is neither abandoned nor orphaned, a court must apply a two-part test. First, the court must find by clear and convincing evidence that the grant of permanent custody to the CSB is in the best interests of the child.
 Second, the court must find by clear and convincing evidence that the child cannot or should not be placed with either natural parent * * *.
In re Hoff (July 28, 1993), Wayne App. No. 2781, unreported, at 3, citing R.C. 2151.414(B) and In re Higby (1992), 81 Ohio App.3d 466,469. See, also, In re Burmeister (Jun. 16, 1999), Summit App. No. 19200, unreported, at 7-8. When considering whether a child cannot be placed with the parent in a reasonable time or should not be placed with the parent, the focus is on the needs of the child and whether a parent can meet those needs. Higby, supra, at 470. Clear and convincing evidence is that which will produce in the trier of fact a reasonable certitude as to the facts sought to be established. In re Adoption of Holcomb (1985), 18 Ohio St.3d 361,368.
The trial court had before it abundant evidence that these children should not be placed with their father. It was undisputed that James has never attempted to provide a safe and clean home for these children. This evidence supports a mandatory finding that these children cannot be placed with James within a reasonable time, pursuant to R.C. 2151.414(E)(1). There was undisputed testimony that these children required a very structured environment, with a great deal of adult involvement and direction. James had nearly a year in which to comply with the case plan, yet he never did anything more than attend the supervised visitation sessions on occasion. He did not interact with the children at these sessions, but merely observed them. On occasion, he did not even observe the children interacting with their mother, but stared blankly into space. James never participated in any parenting classes to enhance his ability to interact with his children. This failure to comply with the case plan demonstrates James' lack of commitment to the children and supports a mandatory finding that the children cannot be placed with James within a reasonable time pursuant to R.C.2151.414(E)(4).
Based on the foregoing, we find that there was clear and convincing evidence for the trial court to find that these children cannot be placed with their father within a reasonable time. R.C. 2151.414(B). Therefore, we overrule James' assignment of error.
Having overruled both appellants' assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
 KK
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellants.
Exceptions.
WILLIAM R. BAIRD FOR THE COURT CARR, J.
WHITMORE, J. CONCUR
[1] According to the testimony presented at the magistrate's hearing, Christina, James and the children were residing in the home of Christina's sister and her family. There were several teenagers living in the home, as well as several other young children.
[2] By this time James and Christina had separated, and had no plans to live together. James has never indicated an interest in becoming the custodial parent for Brittany and Rebecca.
[3] Christina's first assignment of error addresses the lack of adequate facilities in the Juvenile Court to conduct hearings. This Court is well aware that adequate court facilities are essential to ensure that the parties involved have a meaningful opportunity to address the court during proceedings, the outcome of which will impact their substantial rights. It is therefore important that the directives of the Supreme Court Rules of Superintendence which govern court facilities are implemented as fully as possible. See State ex rel. Taylor v. Delaware (1982), 2 Ohio St.3d 17, 18, State, ex rel Hillyer v. Tuscarawas Cty. Bd. of Commrs. (1994), 70 Ohio St.3d 94, 98-99, and Appendix D to the Supreme Court Rules of Superintendence.