DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment of the Lucas County Court of Common Pleas, Juvenile Division, which granted permanent custody of Brad C., Jr., Bryson C. and Breon C. to the Lucas County Children Services ("LCCS"). For the reasons stated herein, this court affirms the judgment of the trial court.
Appellant, Lavon J., mother of Brad C., Jr., Bryson C. and Breon C., sets forth the following assignments of error:
"STATEMENT OF ASSIGNMENTS OF ERROR
 "I. The Trial Court erred in failing to conduct permanent custody proceedings in bifurcated stages and failed to follow Juvenile Rule 29(D) in particular.
 "II. The Trial Court erred in granting permanent custody when no Guardian Ad Litem's report was filed with the Court in compliance with O.R.C. section 2151.414.
 "III. The Trial Court abused it's (sic) discretion in denying father's motion for continuance.
 "IV. The Trial Court's judgment as to the existence of the conditions set forth in O.R.C. sections 2151.414(E)(1) (4) (12) is not supported by clear and convincing evidence.
 "V. The Trial Court erred in not complying with O.R.C. section 2151.419.
 "VI. Appellant Lavon J. was prejudiced because father's attorney did not provide effective assistance of counsel, thus depriving him of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and sections 10 and 16, Article I of the Ohio Constitution, O.R.C. section 2151.352 and Juvenile Rule 4(A) and 29(B).
The following facts are relevant to this appeal. Brad, Jr. was born on August 9, 1993; Bryson was born on November 4, 1994; and Breon was born on December 24, 1996. On April 7, 1998, LCCS filed a complaint in dependency and neglect, seeking permanent custody as well as a motion for a shelter care hearing of the children. In the complaint, LCCS alleged that on April 4, 1998, Lavon contacted LCCS and stated that "someone better come get the children before she killed them." The children were placed with LCCS by the police who had been dispatched to her home.
The complaint also set forth prior contact with Lavon in 1994 and 1995. The contact in 1994 resulted from a referral to LCCS because Lavon had thrown a shoe at Brad and slapped him. The contact in 1995 resulted in Brad and Bryson being found to be dependent and neglected children and temporary custody was awarded to LCCS. Legal custody of the children was returned to Lavon in June 1996.
An expedited hearing was held on April 7, 1998 and temporary custody was granted to LCCS. Two court appointed special advocates/guardian ad litems ("CASAs") were appointed for the children. Counsel was appointed for appellant. LCCS created a case plan with family reunification as the goal.
On June 29, 1999, an adjudicatory hearing was held. Lavon was present with appointed counsel but the father, Brad C., Sr., was not present. The two police officers who responded to Lavon's home on April 4, 1998 testified that Lavon stated to them that she was not able to deal with the children and that she feared for the children in that she might possibly do them harm. According to the officers, Lavon refused to take care of the children and stated that she did not want them any more. Both officers testified that the children were there when Lavon made these statements.
The LCCS investigator who had filed the complaint in this case testified as to the referral and the removal of the children. She also testified that a staffing was held after the removal of the children which Lavon attended. The investigator testified that Lavon had only had the children back in her custody for a couple of months when Lavon called for the children to be removed on April 4. The investigator also testified that Lavon felt a great loss because her grandmother who had been very helpful to her had recently died. The investigator also testified that Lavon did not have a positive relationship with the father of the children and that domestic violence was an issue.
Following this testimony at the adjudicatory hearing, the children were found to be dependent and neglected as to the mother. The case was continued to July 30, 1998 for final disposition and/or reopening of adjudication.
At a hearing on July 30, 1998, the trial court appointed counsel for the father, who it was discovered had not been served by the time of the adjudicatory hearing on June 29, 1998. A pretrial conference was set for August 5, 1998 at which time counsel for the father stipulated to the finding that the children are dependent and neglected.
A final disposition hearing was held on September 15 and 16, 1998. At the beginning of the hearing on September 15, 1998, the court determined that the father was incarcerated at CCNO.[1] The court was able to arrange to have the father brought in for the hearing.
The LCCS caseworker who had worked with the family from August 1994 through the spring of 1997 testified that a case plan for ongoing services on a non-custody basis was begun as a result of an allegation that Lavon had thrown a shoe at Brad, Jr. when she became upset. This caseworker testified that Lavon was living with her grandmother in her grandmother's custody, a living situation which Lavon reported was "very chaotic" as the grandmother also had custody of other children. This caseworker testified that Lavon also reported that the grandmother was an alcoholic. This caseworker also testified that when Lavon had her second child she moved from her grandmother's house. Domestic violence with the father became an issue when Lavon had her own housing. This caseworker also testified that she would periodically receive telephone calls from Lavon in which Lavon would say that she was overwhelmed and wanted the caseworker to remove the children. This caseworker further testified that services included an in-home family advocate and a staff support person to deal with the medical problems that Bryson had. Other services included a psychiatric evaluation, domestic violence counseling, parenting classes and early intervention. Also, for approximately three months after his birth, Breon was placed with Lavon's aunt. This caseworker testified that the father had not participated in any services although this caseworker had discussed domestic violence services with him. The caseworker testified that the children were removed in 1998 for the same reasons that the children were removed in 1994. She also testified that she could not think of any services that could have been implemented that were not implemented and that Lavon was unable to cope with crises with which most people cope.
A clinical therapist who worked with Lavon between 1995 and 1996 in individual counseling and a women's victims' group for domestic violence testified. The therapist testified that she worked with Lavon on attending counseling and controlling her anger. The therapist testified that she asked Lavon to go to group because of inconsistent attendance in individual therapy. The therapist testified that Lavon did much better in group and gained some control over her temper, although Lavon only attended approximately fifty percent of either individual or group sessions. The therapist also referred Lavon for a psychiatric evaluation because of Lavon's mood swings and history of depression.
The LCCS caseworker who had worked with the family from the spring of 1997 testified that when she became involved in the case, the family had been reunified and that she monitored the case. Day care was initially provided so Lavon could attend school but was stopped when she did not attend; attempts to place a family advocate were rejected by Lavon. This caseworker testified that she had discussed domestic violence counseling with the father and he had agreed to go but never did. This caseworker testified that this case was kept open as a non-custody case from March 1997 through December 1997 when the case was closed. This caseworker testified that although Lavon did not complete services[2], LCCS closed the case in December 1997. The case was closed in spite of these concerns because the family risk assessment was low as the father was not residing in the home at that point in time and Lavon thrived when he was absent and she was able to keep things together. This caseworker testified that it would be in the children's best interests if permanent custody were granted to LCCS.
The LCCS caseworker who had worked with the family from May 1998 testified that she became involved in the case after the children had been removed in April 1998. She testified that she recommended the following services to Lavon: domestic violence counseling and individual counseling for her impulsiveness and her anger. This caseworker testified about her attempts to contact the father and that she recommended the following services to him: a drug assessment, domestic violence counseling and individual counseling. She also testified about the two older children's behavior. Brad and Bryson have continued to punch and hit each other and other children. She testified that assessments were done on both older boys and the therapist thinks that they need to be checked for attentive deficit hyperactivity disorder in the future. This caseworker testified that it would be in the children's best interests if permanent custody were granted to LCCS.
Lavon's counselor from Harbor Behavioral Health Care testified that she conducted an assessment on Lavon in May 1998 and then began working with her on anger management, self-esteem issues and independence issues in individual counseling. This counselor testified that Lavon has demonstrated a greater ability to manage her anger; that she is working; and that she has established some outside support with other community agencies. This counselor also testified that Lavon still has issues to work on including continued independence, parenting issues, improved self-esteem and continued anger management. Her counselor testified that Lavon has the potential to be successful in dealing with these issues. Her counselor testified that Lavon expresses care, concern and love for the children during the counseling sessions. Her counselor opined that Lavon is on the right track to be a good parent if her children were returned to her because the counselor has observed Lavon mature, pursue goals and develop a support system outside her family. On cross-examination, the counselor admitted that she has seen Lavon while she has not had custody of her children and, therefore, while she has not had the stress that resulted in Lavon's past problems. On cross-examination, the counselor also admitted that she did not have any understanding of the special problems that the children might be experiencing.
The program manager of the child and parent program Harbor Behavioral Health Care testified that she worked with Lavon and the two older boys in individual sessions during visits at LCCS from October through December 1995. The focus of the sessions was behavior management, teaching Lavon how to handle both the boys together. This individual testified that Lavon was able to use the skills the counselor demonstrated; the counselor also testified that Lavon's bonding with the children was excellent. The sessions ended when Lavon became involved with Early Intervention. On cross-examination, the counselor admitted that she had not seen Lavon since the December 1995 session; the counselor also admitted that she was unaware that Lavon had a third child and admitted that she had no opinion as to whether or not Lavon could parent the children today. On cross-examination, the counselor also admitted that the addition of a third child would be a stress factor for Lavon.
An outreach worker who worked with Lavon testified that Lavon contacted the family center asking for help in July 1998. This outreach worker testified that the family center is a support system for families and offers parenting classes, transportation and other resources. This outreach worker testified that she went to Lavon's home twice a month and discussed stress management, discipline and coping with anger and stress. This outreach worker testified that she observed Lavon with the children during one visitation at LCCS in July 1998.
The paternal grandmother testified that she has seen changes in Lavon in recent years in that Lavon is maturing, growing up, less volatile and handling things better.
One of the CASAs who has been involved with the family since April 1994 testified and recommended that LCCS be granted permanent custody of the children and further recommended that the children have therapy. The CASA testified that Lavon has little or no bonding with the children; that the boys show no separation anxiety; that the boys' behavior is very aggressive and that they fight with each other and other children; and that they wear diapers at night because they wet the bed almost every night. The CASA further testified that Lavon does not have very good control over the boys.
On October 19, 1998, the trial court entered a judgment entry awarding permanent custody of the children to LCCS. Appellant filed a timely notice of appeal.
In her first, third and sixth assignments of error, appellant asserts that alleged trial court errors in regard to the father in this case should also serve as a basis for reversal of the judgment as to her. However, appellant asserts no arguments as to how these alleged errors were in any manner prejudicial to her. This court finds no merit in these assignments of error.
Appellant cites this court's opinion in In re Smith
(1991), 77 Ohio App.3d 1, in support of these assignments of error. In that case, this court stated: "An appealing party may complain of an error committed against a non-appealing party when the error is prejudicial to the rights of the appellant. (Citation omitted.) Id. at 13. In the case sub judice, the errors which appellant asserts in regard to the father were not prejudicial to her, as appellant made no arguments of prejudice.
Accordingly, appellant's first, third and sixth assignments of error are found not well-taken.
In her second assignment of error, appellant argues that the trial court erred in granting permanent custody when no guardian ad litem report was filed with the court in compliance with R.C. 2151.414. This court finds no merit in this assignment of error.
R.C. 2151.414(C) provides in part:
 "(C) * * * A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section or section 2151.35 of the Revised Code but shall not be submitted under oath."
Appellant cites In the Matter of: Alexander Eplin (June 29, 1995), Stark App. No. 94 CA 0311, unreported, in support of her assignment of error. However, that case is readily distinguishable from the case sub judice. In Eplin, there was no proof in the record before the appellate court that a written report by the guardian ad litem had ever been submitted to the trial court. In the case sub judice, a written report was submitted by the guardian ad litem on May 19, 1998, prior to the adjudicatory hearing and is contained in the record.
Accordingly, appellant's second assignment of error is found not well-taken.
The court will address appellant's fourth and fifth assignments of error together as they are interrelated. In her fourth assignment of error, appellant argues that the trial court's judgment as to the existence of conditions set forth in R.C. 2152.414(B) (E)(1), (4) and (12) is not supported by clear and convincing evidence. In her fifth assignment of error, appellant argues that the trial court erred in not complying with R.C. 2151.419. This court finds no merit in these assignments of error.
R.C. 2151.414(B)(1)(a)[3] sets forth the criteria and the clear and convincing evidence standard that the trial court must apply in making its determination that it is in the best interest of the child to grant permanent custody to the agency. R.C. 2151.414(E)[4] requires the trial court to find that the child cannot be placed with either of his or her parents within a reasonable time or should not be placed with the parents once the court has determined by clear and convincing evidence that one or more of the enumerated factors exist. Once the trial court finds from all relevant evidence that one of the enumerated factors exists, it then must consider whether permanent commitment is in the best interest of the child. R.C. 2151.414(D).[5]
Only then may it grant permanent custody of the child to the agency.
On appeal, this court must determine if the lower court complied with the statutory requirements of R.C. 2151.353 and 2151.414 and whether there was sufficient evidence to support a finding by clear and convincing evidence that one or more of the factors listed in R.C. 2151.414(E) exist. Permanent custody may not be granted unless the trial court finds clear and convincing evidence that one or more of the enumerated factors in R.C.2151.414(E) exist. In re William S. (1996), 75 Ohio St.3d 95, 101. Clear and convincing evidence is that level of proof which would cause the trier of fact to develop a firm belief or conviction as to the facts sought to be proven. Cross v. Ledford
(1954), 161 Ohio St. 469, paragraph three of the syllabus. The trial court must consider the best interests of the child by examining the factors listed in R.C. 2151.414(D). An appellate court will not reverse a trial court's determination concerning parental rights and child custody unless the determination is not supported by sufficient evidence to meet the clear and convincing standard of proof. In re Adoption of Holcomb (1985), 18 Ohio St.3d 361,368 and In re Ball (1982), 5 Ohio App.3d 56, 58.
This court has thoroughly reviewed the entire record in this case. Upon consideration of the law and of the entire record of the proceedings in the trial court, this court finds that there was clear and convincing evidence presented at the hearing to support the trial court's decision. The evidence clearly supports the trial court's award of permanent custody and the trial court's decision that permanent commitment was in the best interest of Brad C., Jr., Bryson C. and Breon C.
Appellant also asserts that the trial court did not comply with R.C. 2151.419(A)(1) and (B)(1).[6] Specifically, appellant argues that the trial court did not describe the relevant services provided by the agency.
The judgment entry of the trial court in the case subjudice clearly reflects that the trial court complied with R.C.2151.419(A)(1) and (B)(1). In several places in the judgment entry, the trial court details the services provided by LCCS.
Accordingly, appellant's fourth and fifth assignments of error are found not well-taken.
On consideration whereof, the court finds that substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the court costs of this appeal.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 ______________________________ Peter M. Handwork, J.
Resnick, J., Knepper, P.J. CONCUR.
[1] The father's mother testified during the hearing that the father was incarcerated on some old warrants.
[2] Brad and Bryson were described as "very aggressive little boys," who hit, punched and kicked each other and were very aggressive with their younger brother Breon; the language Brad and Bryson used was also described as not appropriate for their age. LCCS wanted diagnostic assessments done on them and although Lavon initially agreed, no diagnostic assessments were ever done. Additionally, Lavon was to have undergone an assessment at Compass because Breon tested positive for marijuana; also Lavon was to become involved with anger management counseling. Lavon did neither of these services. The father also never participated in domestic violence counseling.
[3] R.C. 2152.414(B)(1)(a) provides:
 "(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."
[4] R.C. 2151.414(E) provides:
 "(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reason able time or should not be placed with either parent:
 "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 "(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
 "(3) The parent committed any abuse as described in section 2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;
 "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 "(5) The parent is incarcerated for an offense committed against the child or a sibling of the child;
 "(6) The parent has been convicted of or pleaded guilty to an offense under division (A) or (C) of section 2919.22 or under section 2903.16, 2903.21, 2903.34, 2905.01, 2905.02, 2905.03, 2905.04, 2905.05, 2907.07, 2907.08, 2907.09, 2907.12, 2907.21, 2907.22, 2907.23, 2907.25, 2907.31, 2907.32, 2907.321, 2907.322, 2907.323, 2911.01, 2911.02, 2911.11, 2911.12, 2919.12, 2919.24, 2919.25, 2923.12, 2923.13, 2923.161, 2925.02, or 3716.11
of the Revised Code and the child or a sibling of the child was a victim of the offense or the parent has been convicted of or pleaded guilty to an offense under section 2903.04 of the Revised Code, a sibling of the child was the victim of the offense, and the parent who committed the offense poses an ongoing danger to the child or a sibling of the child.
 "(7) The parent has been convicted of or pleaded guilty to one of the following:
 "(a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
 "(b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 "(c) An offense under division (B)(2) of section 2919.22
of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
 "(d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 "(e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.
 "(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
 "(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
"(10) The parent has abandoned the child.
 "(11) The parent has had parental rights involuntarily terminated pursuant to section 2151.353, 2151.414, or 2151.415 of the Revised Code with respect to a sibling of the child.
 "(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.
 "(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.
 "(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
 "(15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.
"(16) Any other factor the court considers relevant."
[5] R.C. 2151.414(D) provides:
 "(D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the
 Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition issued under section 2151.353 or 2151.415
of the Revised Code for twelve or more months of a consecutive twenty-two month period ending on or after the effective date of this amendment;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 "(5) Whether any of the factors in divisions (E)(7) to (12) of this section apply in relation to the parents and child."
[6] R.C. 2151.419(A)(1) and (B)(1) provide in part:
 "(A)(1) Except as provided in division (A)(2) of this section, at any hearing held pursuant to section 2151.28
or 2151.353 of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts. In determining whether reasonable efforts were made, the child's health and safety shall be paramount.
"* * *
 "(B)(1) A court that is required to make a determination as described in division (A)(1) or (2) of this section shall issue written findings of fact setting forth the reasons supporting its determination. If the court makes a written determination under division (A)(1) of this section, it shall briefly describe in the findings of fact the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from the child's home or enable the child to return safely home.
"* * *."