[Cite as *In re W.B.*, 2012-Ohio-3898.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

IN THE MATTER OF:

    W.B.,

                              CASE NO.  5-12-15

ALLEGED NEGLECTED AND
DEPENDENT CHILD,

                              **O P I N I O N**

[ZACHARY BROOKS - APPELLANT].

**Appeal from Hancock County Common Pleas Court
Juvenile Division
Trial Court No. 21130004**

**Judgment Affirmed**

**Date of Decision:    August 27, 2012**

APPEARANCES:

    *Nicole M. Winget*  **for Appellant**

    *Mark C. Miller and Rebecca S. Newman*  **for Appellee**

Case No. 5-12-15

**SHAW, P.J.**

{¶1} Father-appellant Zachary Brooks ("Brooks") appeals the March 23, 2012, judgment of the Hancock County Court of Common Pleas, Juvenile Division, awarding permanent custody of the minor child "W.B." to Hancock County Job and Family Services-Children's Protective Services Unit (hereinafter "CPSU" or "the agency").

{¶2} The facts relevant to this appeal are as follows. The minor child W.B. was born in November of 2009. Brooks was determined to be the father of W.B. W.B.'s mother is deceased, having been murdered on approximately March 28, 2011.[1] Brooks is currently incarcerated for two counts of obstruction of justice regarding the investigation of the murder of W.B.'s mother.[2]

{¶3} On March 28, 2011, a complaint was filed alleging that W.B. was a dependent and neglected child due to the fact that she was living in unsanitary conditions and due to the fact that there was purportedly domestic violence occurring in the home. According to the complaint, there was a pig living in a closet in the house with W.B., there was a five gallon bucket used as a make-shift port-a-potty that was three-quarters full of waste accessible to W.B., and there was an incident of domestic violence in the home wherein, at the time of this

---

[1] The date used here for the homicide of W.B.'s mother is the date CPSU was notified.
[2] Brooks is scheduled to be released from incarceration in May of 2015.

complaint, the agency was informed that W.B.'s mother may have been a homicide victim. (Doc. 1).

{¶4} On March 28, 2011 a "motion for predispositional interim orders" was filed requesting, *inter alia*, that W.B. be placed in temporary custody of CPSU pending a full hearing on the complaint.

{¶5} On March 28, 2011, an ex parte order was issued granting emergency temporary custody of W.B. to CPSU.

{¶6} On March 30, 2011, Jane Davis was appointed as Guardian Ad Litem ("GAL") for W.B. (Doc. 3).

{¶7} On March 31, 2011 a shelter care hearing was held. Brooks was present at this hearing. (Doc. 5). Ultimately the court found that there was probable cause in granting the ex parte order and the court placed W.B. in emergency temporary custody of CPSU. (*Id.*) Further, the court found that reasonable efforts had been made to prevent the removal of W.B. from the home and that it was in W.B.'s best interests to be removed from the home. (*Id.*)

{¶8} On April 27, 2011 a case plan was filed by caseworker Karmen Lauth. The case plan required Brooks, among other things, to complete a mental health and substance abuse assessment, to find and keep a safe and stable home, and to enroll in and attend a domestic violence program. (Doc. 14).

{¶9} On May 5, 2011, a hearing was held on the complaint that alleged W.B. was a dependent and neglected child. On consent of the parties, W.B. was found to be a dependent and neglected child. (Doc. 15). This was memorialized in a journal entry filed on May 9, 2011. (*Id.*) Disposition was scheduled for June 2, 2011. (*Id.*)

{¶10} On June 2, 2011 the dispositional hearing was held. On June 6, 2011 a judgment entry was filed regarding the June 2 dispositional hearing. (Doc. 19). According to the entry, upon consent of the parties, W.B. was placed in the temporary custody of CPSU. (*Id.*) In addition, the court also adopted the case plan filed that had previously been filed.[3] (*Id.*)

{¶11} On November 21, 2011, CPSU filed a motion for permanent custody of W.B. (Doc. 29).

{¶12} A final hearing on CPSU's motion for permanent custody was held March 20, 2012. At the final hearing caseworker Karmen Lauth testified that she was the ongoing caseworker in the matter of W.B. (Tr. at 15). Lauth testified that the agency became involved in this matter based upon reports that home conditions for W.B. were not safe. These conditions included a pig found living in the home closet, and a "port-a pot" within W.B.'s reach in the home. (Tr. at 20).

---

[3] On June 2, 2011, a second case plan was filed by caseworker Karmen Lauth largely mirroring the first case plan. Although according to Lauth's testimony the case plans were identical, it was the case plan filed June 2, 2011 that was adopted by the court.

Case No. 5-12-15

{¶13} At the hearing Lauth also testified that W.B.'s mother was killed in a homicide, having been beaten and stabbed. (Tr. at 19). According to Lauth, Brooks pled guilty to two counts of obstruction of justice regarding the investigation of W.B.'s mother's death. (Tr. at 40-41). Lauth testified that Brooks entered into a joint sentencing recommendation of two years on each count of obstruction of justice to be served consecutively, giving Brooks an effective release date from prison of May of 2015. (Tr. at 45).

{¶14} Lauth testified that during the pendency of this case Brooks missed one of his two scheduled supervised visits with W.B. According to Lauth, Brooks said he missed the appointment because he was confused about the time. (Tr. at 52). Lauth testified that the one supervised visit Brooks did attend did not go well as W.B. was unwilling to go with Brooks, screaming and crying, clinging to the monitor. (Tr. at 50). Lauth testified that the visit was ended after 10-15 minutes. (*Id.*)

{¶15} Lauth testified that the agency filed for permanent custody because Brooks was incarcerated, Brooks could not provide for W.B., and W.B. needed permanency. (Tr. at 53). Lauth testified that relative placement was not an option as a sex offender resided in the home of the maternal grandparents and W.B.'s paternal grandmother had four children permanently removed from her custody. (Tr. at 57-58). Further, Lauth testified that Brooks would not be able to meet the

-5-

objectives in his case plan and that Brooks, at best, had only met one objective (psychological evaluation).

{¶16} In elaborating on her reasoning that Brooks could not provide for W.B. Lauth testified specifically that Brooks was 19 and did not appear to understand the developmental stages of a child. (Tr. at 68-69). Lauth further testified that Brooks did not possess the skills to take care of W.B. and could not acquire them even with a twelve month extension. (Tr. at 84).

{¶17} Finally, Lauth testified that W.B. got along well with her foster parents despite originally struggling with being around males. (Tr. at 88). Lauth also testified that she believed there was a very high probability that W.B. would be adopted. (Tr. at 94). In conclusion, Lauth testified that it was her opinion to a reasonable degree of certainty as assessor that the agency should get permanent custody of W.B. (Tr. at 93).

{¶18} Doctor David K. Connell then testified at the hearing. Dr. Connell testified that he had been a clinical psychologist since 1993 and that he was asked to perform an evaluation of Brooks. (Tr. at 103). Dr. Connell testified that he met with Brooks on two occasions and that he administered a personality test and an intelligence test to Brooks. According to Dr. Connell, Brooks' IQ placed him in the range of mild mental retardation. (Tr. at 119). Based on this, Dr. Connell

testified that it would be difficult for Brooks to be an effective parent and that Brooks would probably need a lot of help. (*Id.*)

{¶19} Dr. Connell also testified that Brooks thought W.B. should be able to control her bowels at less than 2 years of age and that Brooks thought W.B. only needed her diaper changed when she cried. (Tr. at 134). Dr. Connell then testified that to a reasonable degree of psychological certainty, he did not believe Brooks has provided or could provide for W.B. and that it would be in the best interest of W.B. to award permanent custody to the agency.

{¶20} After Dr. Connell finished testifying, the State rested its case. Although counsel for Brooks cross-examined the witnesses, Brooks presented no testimony and entered no exhibits into evidence.

{¶21} Before the conclusion of the hearing, the GAL made a statement that she felt it was in the best interests of W.B. that permanent custody be awarded to CPSU. The GAL further testified that she believed Brooks would not be able to provide a safe and stable home even when released from prison. (Tr at 177).

{¶22} The matter was thus submitted for the court's judgment.

{¶23} On March 23, 2012 the trial court issued its judgment entry awarding permanent custody of W.B. to CPSU. In the entry, the court found by clear and convincing evidence that W.B. could not be placed with Brooks within a reasonable time, and that it would be in the best interests of W.B. to grant

permanent custody to the agency. (Doc. 53). It is from this judgment that Brooks appeals, asserting the following assignment of error for our review.

**ASSIGNMENT OF ERROR**
**THE TRIAL COURT ERRED WHEN IT FOUND BY CLEAR AND CONVINCING EVIDENCE THAT THE AWARD OF PERMANENT CUSTODY TO THE HANCOCK COUNTY JOB AND FAMILY SERVICES WAS WARRANTED.**

**{¶24}** In Brooks' assignment of error he argues that the trial court erred by awarding permanent custody of W.B. to CPSU. Specifically Brooks argues that clear and convincing evidence was not presented at the hearing showing that W.B. could not be placed with Brooks within a reasonable time and that it was not in W.B.'s best interests for permanent custody to be awarded to CPSU.

**{¶25}** As an initial matter, we note that "[i]t is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Franklin*, 3d Dist. Nos. 9-06-12, 9-06-13, 2006-Ohio-4841, ¶ 9, quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997) (citation omitted). The Supreme Court of Ohio has held that a parent "must be afforded every procedural and substantive protection the law allows." *In re Hayes, supra*, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (1991). Thus, it is with these constructs in mind that we proceed to determine whether the trial court erred in granting permanent custody of the children to the agency.

**{¶26}** Section 2151.414(B)(1) of the Revised Code provides, *inter alia*, that a trial court

**may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**

**(a)   The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**

**(b)   The child is abandoned.**

**(c)   The child is orphaned, and there are no relatives of the child who are able to take permanent custody.**

**(d)   The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and * * * the child was previously in the temporary custody of an equivalent agency in another state.**

R.C. 2151.414(B)(1)(a-d).

{¶27} The Supreme Court of Ohio has held that "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954).  Further, "[i]t is intermediate, being more than a mere preponderance, but not to the extent of such

certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Id.,* citing *Merrick v. Ditzler*, 91 Ohio St. 256 (1915). In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross, supra* (citations omitted); *see, also, In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985).

{¶28} In regards to making a finding pursuant to R.C. 2151.414(B)(1)(a) that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent, the Revised Code states:

> **(E) In determining at a hearing held pursuant to division (A) of this section * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * *** *that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:*
>
> **(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric,**

**psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

\* \* \*

**(4)   The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**

\* \* \*

**(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.**

\* \* \*

**(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.**

(Emphasis Added.)  R.C. 2151.414(E)(1, 4, 12, 14).

{¶29} In addressing the factors in R.C. 2151.414(E), the trial court held the following:

**This court further finds that under Revised Code Section 2151.414(E)(12) that the sole parent is incarcerated for a crime that involves an obstruction of justice regarding the investigation of the murder of the child's mother and will be incarcerated for a period that exceeds eighteen months after the date of the filing of the motion for permanent custody.  The**

-11-

> **court further finds that the father has been diagnosed with mild mental retardation, marijuana dependence, and antisocial personality. Psychologist David Connell opines that there is no compelling evidence that (father) has the emotional, behavioral, social, or cognitive skills to provide for the healthy development of his daughter.**
>
> **\* \* \***
>
> **Since father is the sole parent and was incarcerated at the time of the filing of permanent custody motion and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody as specified in Revised Code Section 2151.414(E)(12), this court is mandated to find that the child cannot be placed with the parent within a reasonable time.**

(Doc. 53). The court also found that "the father has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the home." (*Id.*)

{¶30} Brooks takes issue with several of the trial court's findings on appeal. Brooks argues that the trial court erred in finding that W.B. could not be placed with him within a reasonable time because Brooks was eligible for judicial release and therefore it was not certain that he will be in prison eighteen months from the agency's filing for permanent custody. Brooks also argues that the testimony of Dr. Connell challenging Brooks fitness to be a parent was contrary to Brooks' willingness to cooperate with case plan services. In addition, Brooks argues that the trial court improperly emphasizes Brooks' incarceration for

obstruction of justice in the investigation of the death of W.B.'s mother to show his lack of parental abilities.

{¶31} Brooks' first argument that his sentence was not definite because he was eligible for judicial release is completely speculative. Karmen Lauth testified at the final hearing that Brooks was indicted and incarcerated in May 2011 for two counts of obstruction of justice, pled guilty to those two counts, and entered into a joint sentencing recommendation consisting of a total four-year prison term. (Tr. at 38-39, 45); (CPSU Ex. 7, 8). This prison term was not scheduled to end until May of 2015. (Tr. at 45). There is nothing in the record to suggest that Brooks will definitely be getting judicial release. In fact, the only testimony in the record related to judicial release *at all* is the following exchange on cross examination of Lauth:

**Q: There's a potential for early release; is there not?**

**A: That's what Mr. Brooks has told me, yes.**

(Tr. at 165). Nothing else in the record indicates that Brooks has a release date other than May of 2015. The trial court's finding was thus supported by clear and convincing evidence.

{¶32} As to Brooks' argument that Brooks was willing to cooperate with the case plan, this is directly contradicted in the record by the testimony of Lauth, the caseworker who designed the case plan. Lauth testified that Brooks had only

completed one objective of the case plan, failing to complete any of the others. (Tr. at 79). At the time of the final hearing Brooks had taken no parenting or domestic violence classes. This is especially critical based upon the fact that Brooks scored a 58 on his IQ test indicating mild mental retardation, which according to Dr. Connell, would require Brooks to have "a lot of help in being an effective, responsible parent." (Tr. at 119). Brooks had also in no way established a safe and stable home for W.B. Moreover, Brooks expressed an interest in moving back in with his parents following his incarceration—a home which had been determined not suitable for relative placement. On top of this, Brooks had missed one of two appointments with W.B. stating that he was mistaken about the time.

{¶33} As to Brooks' argument that the trial court improperly used Brooks' incarceration for obstruction of justice to show Brooks' lack of parenting abilities, we find that the trial court's statements were supported by the record. At the final hearing Dr. Connell testified that Brooks originally told Dr. Connell that Brooks was not at home during the homicide of W.B.'s mother. According to Dr. Connell, during the second meeting, Brooks changed his story. Dr. Connell testified that Brooks told Dr. Connell during their second meeting that Brooks and W.B. were home while W.B.'s mother was beaten, screaming, in a bedroom from 3 p.m. to 9:30 p.m. (Tr. at 123-131). Dr. Connell testified that Brooks told Dr.

Connell that Brooks tried to intervene but a knife was put to his throat so Brooks went back to playing a game. (Tr. at 126). Brooks' actions in this incident are entirely relevant to the issue of his personal responsibility and his ability as a parent.

{¶34} Based on all of the foregoing, we find that there was clear and convincing evidence to support the trial court's determination that W.B. could not be placed with Brooks within a reasonable time.

{¶35} Although we have determined that there was clear and convincing evidence to support the trial court's decision that W.B. could not be placed with Brooks within a reasonable time, we still must determine whether there was clear and convincing evidence to support the trial court's decision that it was in W.B.'s best interests for permanent custody to be awarded to the CPSU. When determining whether granting permanent custody to CPSU is in the best interest of the child, the court must consider all of the relevant factors listed in R.C. 2151.414(D)(1), including:

> **(a)   The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(b)   The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(c)   The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period * * *;**

**(d)   The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e)   Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

**{¶36}** In the trial court's judgment entry, after stating that it had considered all of the factors in R.C. 2151.414(D), the trial court found "by clear and convincing evidence that it would be in the best interest of [W.B.] to grant her permanent custody to CPSU." (Doc. 53). On appeal, Brooks generally argues that this finding was not supported by clear and convincing evidence.

**{¶37}** With regard to factor (a), there was evidence presented at the hearing that W.B. had been living in unsanitary conditions. Moreover, evidence was presented that Brooks did not possess parenting skills, that Brooks made no effort to acquire these skills (aside from a loose statement that he was willing to take classes), that Brooks lacked the mental acumen to care for W.B., and that in the one interaction Brooks had with W.B. since these proceedings began, W.B. screamed and clung to the monitor until the visit was concluded early. Furthermore, evidence was presented by Lauth that W.B. got along very well with

her foster parents and that W.B. was in a foster-to-adopt home. Lauth testified there was a very high probability W.B. would be adopted.

{¶38} With regard to factor (b), the wishes of W.B. were expressed through Jane Davis, the GAL. Davis filed a report and reiterated at the hearing that it would be in W.B.'s best interest to be placed in the permanent custody of CPSU. Davis also testified that even after released she did not believe Brooks would be able to provide a safe and stable home.

{¶39} With regard to factor (c), W.B. had been in custody of the agency since March 28, 2011 and the motion for permanent custody was filed November 21, 2011. While this did not amount to a consecutive 12 months of a 22 month period, Brooks had only seen his daughter one time and had missed one of *two* scheduled appointments to see his daughter.

{¶40} With regard to factor (d), Lauth and the GAL testified that W.B. was in need of a legally secure permanent placement and Lauth testified that adoption in W.B.'s case was highly probable.

{¶41} With regard to factor (e), none of the factors appear to be relevant to this particular case.

{¶42} Based on the foregoing we find that there was clear and convincing evidence to support the decision made by the trial court that it was in the

children's best interest for permanent custody to be awarded to CPSU. Accordingly, Brooks' assignment of error is overruled.

{¶43} For the foregoing reasons the judgment of the Hancock County Court of Common Pleas, Juvenile division, is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**