[Cite as *In re C.B.*, 2012-Ohio-4012.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

IN THE MATTER OF:

    C.B.,                                                      CASE NO. 17-12-05

ADJUDGED ABUSED AND
NEGLECTED CHILD.                                        **O P I N I O N**

[APRIL BOLIN - APPELLANT].

IN THE MATTER OF:

    N.B.,                                                      CASE NO. 17-12-06

ADJUDGED DEPENDENT CHILD.

                                 **O P I N I O N**

[APRIL BOLIN - APPELLANT].

**Appeals from Shelby County Common Pleas Court
Juvenile Division
Trial Court Nos. 2009-ABU-0012 and 2009-DEP-0006**

**Judgments Affirmed**

**Date of Decision:   September 4, 2012**

APPEARANCES:

    *Heath H. Hegemann*  for Appellant

    *Rachael E. Stir*  for Appellee

**SHAW, P.J.**

{¶1} Mother-appellant April Bolin ("April") appeals the January 20, 2012, judgments of the Shelby County Court of Common Pleas, Juvenile Division, awarding permanent custody of her two children "C.B." and "N.B." to the Shelby County Department of Job and Family Services—Children Services Division (hereinafter "CSD" or "the agency").

{¶2} The facts relevant to this appeal are as follows. April's daughter C.B. was born in December, 2003, and April's son N.B. was born in September, 2005.

{¶3} On September 22, 2009, a complaint was filed alleging C.B. was an abused and neglected child and a second complaint was filed alleging that N.B. was a dependent child. (Docs. 1, 1).[1] The complaints alleged that C.B. had been the victim of sexual abuse perpetrated by her biological father, Jason Bolin.[2] (*Id.*) The complaint further alleged that the children were frequently coming to school "dirty and smelling of urine." (*Id.*) In addition, there was an allegation of an incident that occurred on September 4, 2009, wherein Sidney police were called to the Bolin home due to N.B. lying on the porch with no shoes or shirt with his body and pants soiled and no one home at the Bolin residence. (*Id.*)

---

[1] The first number in the cited in the series here and hereinafter corresponds to the record relating to C.B. and the second corresponds to the record relating to N.B.
[2] It would later be determined that Jason Bolin had also sexually abused N.B. as well.

{¶4} Concerns were also raised in the complaint about April being insistent on reunifying with Jason Bolin and April's desire to bring Jason back into the home with the children after Jason was released from prison (Jason Bolin had pled guilty to gross sexual imposition regarding C.B. and was incarcerated for it). (*Id.*)

{¶5} On October 13, 2009, Steven Geise was appointed as Guardian Ad Litem ("GAL") for April as April had limited cognitive abilities. (Docs. 23, 24). A later psychological evaluation stated that April suffered from, *inter alia*, Mild Mental Retardation.

{¶6} On October 13, 2009, Bridget Davis was appointed CASA/GAL for C.B. and N.B. (Docs. 25, 26).

{¶7} On October 29, 2009, the parties stipulated to the facts as alleged in the complaint, which, in the case of C.B., supported a finding of abuse pursuant to R.C. 2151.031 (a), (b) and (d) and neglect pursuant to R.C. 2151.03 (b), (d) and (f), and in the case of N.B, supported a finding of dependency pursuant to R.C. 2151.04(B), (C), and (D). However, despite the stipulation, April disagreed with some of the allegations with regard to N.B. being soiled and partially unclothed outside the vacant Bolin home on the doorstep.[3] (Docs. 50, 50). April did, however, plead guilty to one count of disorderly conduct pertaining to that incident. (*Id.*)

---

[3] This disagreement was handwritten onto the typed copies of the stipulation in the record.

{¶8} On November 3, 2009, two judgment entries were filed titled "Consent Order/Entry of Adjudication." The first found that C.B. was abused and neglected as stipulated and ordered that C.B. should remain in the pre-dispositional interim custody of April subject to protective supervision by the agency, and the second found that N.B. was dependent and ordered that he should also remain in April's interim custody subject to protective supervision by the agency. (Docs. 53, 53).

{¶9} On December 10, 2010, "Consent Order[s]/Entr[ies] of Disposition" were filed adopting a case plan filed October 28, 2009, and further ordering that C.B. and N.B. should remain in the custody of April subject to protective supervision being granted to the agency (Docs. 56, 56).

{¶10} On March 1, 2010, the State filed a motion for emergency temporary custody of C.B. and N.B. on grounds that April had voluntarily requested the agency to assume custody on February 26, 2010. (Doc. 62, 62).[4] On the date of April's request, C.B. and N.B. were placed in a foster home with Heidi Newberg.

{¶11} On March 1, 2010, the agency was granted ex parte custody of the children pending further hearing. (Doc. 63, 63).

{¶12} On March 3, 2010, a shelter care hearing was held. At the hearing the court found that the agency had been making reasonable efforts to reunify the

---

[4] April signed a written agreement attesting to this.

children with April and that it was in the best interests of C.B. and N.B. to remain in the continued temporary custody of the agency. A review hearing was scheduled for March 30, 2010. (Doc. 73, 72).

{¶13} On March 25, 2010, the agency filed a motion for extension of temporary custody. (Doc. 91, 90).

{¶14} On April 14, 2010 an entry on review was filed extending temporary custody for the agency until March 1, 2011, unless a motion was filed by January 28, 2011. (Docs. 107, 103).

{¶15} On November 12, 2010, April filed a motion to terminate protective supervision and temporary custody of the agency. (Docs. 141, 133).

{¶16} On November 18, 2010, the children's GAL filed a motion for permanent custody to be granted to the agency. (Docs. 145, 137).

{¶17} On December 1, 2010, the agency also filed a motion for permanent custody. (Docs. 146, 138).

{¶18} On December 7, 2010, April filed a memorandum contra to the permanent custody motions. (Docs. 150, 142).

{¶19} On February 17, 2011, April filed a "Motion for Legal Custody" (Docs. 239, 230). On February 18, 2011, April filed an amendment to her motion for legal custody. (Docs. 240, 231). On February 23, 2011, the agency filed a memorandum contra to April's motion for legal custody. (Docs. 248, 239).

{¶20} On March 3, 2010, the GAL filed a report recommending that the agency be granted permanent custody of C.B. and N.B. (Doc. 266, 257).

{¶21} On March 17-18, 2011 a hearing was held on the custody motions. At the hearing, several witnesses testified for both sides. On April 7, 2011, the court filed its "Judgment Entr[ies]/Orders on Permanent Custody Motions." In the entries, the court terminated father Jason Bolin's parental rights finding that "the evidence is without variance that Jason * * * was the perpetrator of sexual abuse upon his daughter (C.B.) resulting in the adjudications regarding C.B. and N.B." (Docs. 286, 279). The court also found by clear and convincing evidence that the children should not ever be placed with Jason due to his pattern of sexual abuse, and further, that Jason expressed through his attorney that termination of his parental rights was in the children's best interests.

{¶22} In regards to April's parental rights, the court held that

**the Court gleaned some effort, albeit low, of April to progress in offered services and become a more involved and patient parent capable of keeping C.B. and N.B. safe. Each witness expressed concern of April's cognitive limitations, her relationship with Jason, and her heightened levels of anger and frustration when dealing with service providers. The witnesses were able to agree that April was making (limited progress) with offered services.**

**\* \* \***

**[T]he Court does not believe it is in the best interests of the children, <u>at this time</u>, to terminate April's parental rights. \* \* \* However, the Court is mindful that permanent custody is an**

> **appropriate disposition if barriers imposed by parents remain and social programs are unsuccessful.**

(Emphasis in original). (*Id.*) April's parental rights were thus not terminated; however, April's motion for legal custody and her motion for termination of protective supervision were overruled. (*Id.*) Pursuant to the entry, the agency's temporary custody of the children was extended for six months. (*Id.*)

{¶23} On August 31, 2011, the agency again filed a motion for permanent custody. (Doc. 308).

{¶24} On September 19, 2011 April filed a memorandum contra to the motion. (Doc. 316).

{¶25} On November 22 and 23, 2011, a hearing was held on the agency's permanent custody motion.

{¶26} At the hearing, the agency first called April, as on cross-examination. April testified that since the last hearing she had moved to Piqua, gotten a part-time job at Goodwill, divorced Jason and started dating Kevin Liming. (Tr. at 13-17). April testified that she lived with Liming in Piqua against the express terms of her case plan and that April and Liming had gotten engaged. (Tr. at 22).

{¶27} The agency next called Karen Rickert, a counseling provider for the agency, who monitored visits between April and the children between March 22, 2011, and September 22, 2011. Karen testified that April exercised supervised visitation with the children three times per week for two hours each day. (Tr. at

32). Karen testified that while April made some strides in understanding what she needed to do for her children during the visits, more times than not Karen had to direct April what to do. (Tr. at 117). According to Karen, April acted more as a playmate to the children than a parent. (Tr. at 115). Karen further testified that at times N.B. would play by himself while C.B. and April would play together. Ultimately Karen testified that April still could not spend two unsupervised hours with her children. (Tr. at 130).

{¶28} Next Kevin Liming testified that he and April started dating sometime in June, shortly after the last hearing in this case, that he and April were now engaged and that they were living together. (Tr. at 135-136). Liming testified that he knew April was not supposed to be living with anyone according to the case plan that had been established for April. (Tr. at 147). Liming's testimony revealed that Liming did not work, received no workers compensation and no benefits and that April paid the bills at their residence. (Tr. at 140). Liming further testified that he had seven children and that he had recently been detained and accused of owing over $50,000 in child support. (Tr. at 183).

{¶29} Julie Maurer testified that she worked with April as part of the Developmental Disability Board until July 7, 2011. (Tr. at 211). Julie testified that she had ongoing concerns about April's family taking advantage of her, in

particular Maurer noted that April's sister Amy may have been living with April at one point as they had turned on a utility together. (Tr. at 218-220).

{¶30} Angie Gehret, an independent social worker with Miami and Darke counties, testified that she saw C.B. and N.B. every other week for 30 minutes each. Gehret testified that the children had anxiety regarding their future if they were to live with April and that the children were worried about leaving their foster family. (Tr. at 251-52). Gehret testified that C.B. had expressed a desire to reduce the number of visits that the children had with their mother. (Tr. at 253). According to Gehret, N.B. did not feel he was getting enough attention in his visits with April. Gehret testified that the children needed permanency and safety and that they suffered from stress induced bowel and bladder problems.

{¶31} Heidi Newberg, the children's foster mother, testified that she had been taking care of the children since February 26, 2010. Newberg testified that the children get anxious around court dates and visits with their mother. According to Newberg, this caused the children to have bowel and bladder problems. (Tr. at 293). Newberg testified that N.B. often lacked bowel control on days he saw his mother and that N.B. became withdrawn after visits. (Tr. at 297). Newberg further testified that N.B. thinks C.B. and April pick on him during visitation and that C.B. does not think Kevin Liming is safe. Newberg testified that she does not think April can keep the kids safe and make good decisions. (Tr.

at 324). Newberg further testified that she has a strong bond with the children and that the children interact well with Newberg's extended family. (Tr. at 327-329). Newberg testified that she desired to adopt the children. (Tr. at 308).

{¶32} Bridget Davis, the GAL for C.B. and N.B., testified that April had no unsupervised visits in almost two years with the children. (Tr. at 341). She testified that she felt April did not check people out thoroughly enough, especially given the children's past relationship with their father. (Tr. at 342). Bridget testified that the children are very attached to their foster parents. (Tr. at 343). Bridget also testified she had concerns over April's quick engagement. (Tr. at 346). Further, Bridget testified

> **I've had a chance to review all of the home coach notes just like everybody else, and there are positives [regarding April's progress] but there's still a lot of negatives. They outweigh the positives. And it's—for me, I've been on this case for two—over two years, and it's like reading the same home coach notes that I read two years ago. There's not a significant improvement in her parenting skills. I think she's more of a playmate or a friend than a mother and she definitely favors C.B. over N.B.**

(Tr. at 342). Ultimately as GAL, Bridget recommended permanent custody be granted to the agency. This was also reflected in her report which was entered into the record.

{¶33} Barb Reindel, a caseworker for the agency, testified that April was still having contact with her sister Amy Teets, who according to the case plan, April was not supposed to have contact with. (Tr at 417). Barb also testified that

April exhibited no consistent change or improvement in her parenting and that April would not receive unsupervised visits with the children in the near future. (Tr. at 425-28). Barb testified that April still needs assistance parenting. (Tr. at 432). Barb also testified that at one point when April was getting serious with Liming, April did not even know Liming's last name, which greatly concerned Barb. (Tr. at 429). Barb testified she had no doubt that permanent custody to the agency was in the children's best interests. (Tr. at 451).

{¶34} After the agency finished calling witnesses and rested, April called Janice Thebert, a case manager who assisted April. Thebert testified that April was very self-sufficient and that she thought April could care for the children. (Tr. at 474).

{¶35} April then called Anita Zakem, a social worker who provided counseling for April. Zakem testified she had seen some progress with April since the last hearing. (Tr. at 543). Zakem did testify, however, that there had been seven cancelations of her bi-weekly sessions with April since March 17, 2011, and that was not counting the three months that the two did not meet.

{¶36} April then called her supervisor at Goodwill, Karen McIntire, who testified that April did well at her part-time employment and was recently offered more hours, which April declined. (Tr. at 582-83).

{¶37} April then testified in her case-in-chief that she had no intention of letting Jason near the kids again, that she loved her kids dearly and that she was working to reunite with them. After she testified, April rested her case.

{¶38} At the conclusion of testimony, the GAL's report was entered into the record, as was a psychological report of April that had been done prior to the first permanent custody hearing. (Ex. 1); (Ex. O). Both exhibits were entered without objection.

{¶39} On January 20, 2011, the court's "Order/Entry on Permanent Custody Motions" was filed awarding permanent custody to the agency. (Docs. 373, 361). In the entry, the trial court summarized the testimony given by each witness, finding the witnesses to be "very credible," "credible," "not relevant," or "not credible." (*Id.*)

{¶40} After reviewing and briefly summarizing the witnesses' testimony, the court concluded the following:

> **In applying the evidence to the motion to terminate parental rights, the court finds by clear and convincing evidence that C.B. and N.B. have been in the temporary custody of a public children services agency uninterrupted since April, 2010 which is twelve or more months of a consecutive twenty-two month period. As such, CSD has met the initial burden of its motion to terminate April Bolin's parental rights.**
>
> **Considering the relevant factors herein, including those as set forth in R.C. 2151.414(D)(1)(a)-(e) the Court finds by clear and convincing evidence, it is in the best interest of C.B. and N.B. to**

**grant CSD permanent custody and terminate April Bolin's parental rights herein.**

**Persuasive to the Court is the strong witness testimony of Angie Gehret, Bridget Davis, Barbara Reindel and Heidi Newberg that C.B. and N.B.'s need for a legally secure placement cannot be achieved with April Bolin due to her parenting deficiencies, sullen approach to offered services, questionable interrelationships, and continued ability to expose C.B. and N.B. to unsafe opportunities (i.e. through exposure to inappropriate family members, suitors, and advantage-seeking individuals). Applying these factors to the love, support and direction received from the children's foster parents, a long term placement with, or adoption by, the Newbergs is in C.B. and N.B.'s best interests.**

**The Court is mindful of April's limited cognitive abilities, but in reaching this best interests conclusion (of C.B. and N.B.) the court did not consider such limitations as the only factor to terminate parental rights. As noted above, the children's need for a legally secure placement can only be achieved through a grant of permanent custody to CSD.**

(*Id.*)

**{¶41}** It is from this judgment that April appeals asserting the following assignment of error for our review.

**ASSIGNMENT OF ERROR**
**THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF THE MINOR CHILDREN TO THE SHELBY COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES, CHILDREN SERVICES DIVISION, AS CLEAR AND CONVINCING EVIDENCE WAS NOT PRESENTED TO ESTABLISH THAT PERMANENT CUSTODY WAS IN THE CHILDREN'S BEST INTERESTS.**

{¶42} In her assignment of error, April contends that there was not clear and convincing evidence to support the trial court's decision granting permanent custody of her two children to the agency. In addition, April argues that the trial court failed to properly consider the interrelationship of April and her children, that the trial court erred in finding that April failed to make significant progress in her efforts to secure permanent placement of her children with her, and that the trial court erred in placing emphasis on the psychological evaluation conducted of April.

{¶43} As an initial matter, we note that "[i]t is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Franklin*, 3d Dist. Nos. 9-06-12, 9-06-13, 2006-Ohio-4841, ¶ 9, citing *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). The Supreme Court of Ohio has held that a parent "must be afforded every procedural and substantive protection the law allows." *In re Hayes, supra*, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991). Thus, it is with these constructs in mind that we proceed to determine whether the trial court erred in granting permanent custody of the children to the agency.

{¶44} Section 2151.414(B)(1) of the Revised Code provides, *inter alia*, that a trial court

> **may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to**

**the agency that filed the motion for permanent custody and that any of the following apply:**

**(a)   The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**

**(b)   The child is abandoned.**

**(c)   The child is orphaned, and there are no relatives of the child who are able to take permanent custody.**

**(d)   The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and * * * the child was previously in the temporary custody of an equivalent agency in another state.**

R.C. 2151.414(B)(1)(a-d).

{¶45} The Supreme Court of Ohio has held that "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). Further, "[i]t is intermediate; being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Id.,* citing *Merrick v. Ditzler*, 91 Ohio St. 256

(1915).  Moreover, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross, supra* (citations omitted); *see, also, In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985).

{¶46} At the outset, we note that April does not dispute the finding of the trial court that the children had been in the agency's temporary custody in excess of the required twelve or more months in a consecutive twenty-two-month period, which would satisfy R.C. 2151.414(B)(1)(d).  Pursuant to the plain language of R.C. 2151.414(B)(1)(d), when a child has been in an agency's temporary custody for twelve or more months of a consecutive twenty-two month period, a trial court need not find that the child cannot or should not be placed with either parent within a reasonable time.  *See* R.C. 2151.414(B)(1)(d).  In her brief, April specifically concedes that the children had been in the agency's temporary custody for longer than twelve months in a consecutive twenty-two month period.  This fact is also supported in the record.  Therefore, we proceed to April's arguments regarding the children's best interests.

{¶47} When determining whether granting permanent custody to the agency is in the children's best interests the court must consider all of the relevant factors listed in R.C. 2151.414(D)(1), including:

**(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**

**(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period * * *;**

**(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

{¶48} In the trial court's entry, the court specifically stated that it had considered the relevant factors of R.C. 2151.414(D)(1)(a)-(e), finding by clear and convincing evidence that it was in C.B. and N.B.'s best interests that permanent custody be awarded to the agency.

{¶49} With regard to factor (a), testimony was presented that April loved her children and that her children reciprocated that feeling. However, under factor (a), the court is to consider more than just the affection of April and the children. While it is true that the children expressed to the GAL and to the social worker that they loved their mother, they also experienced heavy anxiety in having to meet their mother and high anxiety around court dates. This anxiety was causing

the children to have bowel/bladder control problems. Anxiety was such a problem that C.B. had even requested that the number of visits with their mother be reduced. During the visits the children did have with April, testimony was presented that April acted more as a playmate than a parent and that April often favored C.B. over N.B. both with her attention and with gifts.

**{¶50}** Evidence was also presented regarding the children's relationship to their foster family. Testimony was given that the children were safest with their foster family and that the children felt safest with their foster family. Testimony was also presented that the children had a strong bond with their foster family and that N.B. worries about leaving the foster family. The children also expressed anxiety about their future to Angie Gehret if they were to live with April on a permanent basis.

**{¶51}** As for other relationships effecting the children, the evidence showed that April still exercised—at best—questionable judgment in entering into a hasty engagement with Kevin Liming, a man that the children did not think was safe. While Liming may not have had a criminal history, he was essentially living off of April's state-funding and he had been accused of owing a substantial amount of back child support. The court, which saw and heard Liming's testimony in person, characterized Liming as a "charlatan" and found his testimony not to be credible.

**{¶52}** In addition to the questionable relationship with Liming, testimony was presented that April had some level of continued contact with members of her family she was supposed to avoid according to the court-adopted case plan. Barb Reindel testified that April had contact with her sister Amy Teets and that April was in contact with Amy Teets on several occasions. (Tr. at 417-419). April appears to continually exercise poor judgment in being in contact with people who could negatively impact the children's well-being.

**{¶53}** With regard to factor (b), there was no direct testimony at the hearing of what the children's wishes were, but the GAL spoke on the children's behalf, stating that granting permanent custody to the agency was in the children's best interests.

**{¶54}** With regard to factor (c), testimony was presented that the children had been in the temporary custody of the agency for more than twelve months of a consecutive twenty-two month period.

**{¶55}** With regard to factor (d), testimony was presented from several witnesses stressing the children's need for permanency. Testimony was presented that the children were constantly anxious when visiting their mother and around court dates and that is not likely to change if their impermanent situation is continued indefinitely.

{¶56} There was testimony at the final hearing that April had made some limited progress in learning to redirect and discipline her children but there was also testimony that April had made no consistent changes or improvements in her parenting. At the time of the final hearing, the children had been in custody of the agency for going on two years and April still was not exercising unsupervised visits, and, according to Barb Reindel, April would not be receiving unsupervised visits in the near future. Moreover, testimony was given that more often than not April still had to be directed in how to deal with her children.

{¶57} The children had grown attached to their foster family, and the children's foster mother Heidi Newberg testified that she hoped to adopt the children. In its judgment entry awarding permanent custody to the agency, the court emphasized the children's need for permanency and the evidence clearly and convincingly suggests that if the current situation is continued permanency is a long way off for children who have already been in a foster home for nearly two years.

{¶58} With regard to factor (e), nothing in factor (e) appears to apply to this case.

{¶59} In sum, evidence was presented of the children's need for permanency, of the children's positive relationship with their foster family, of the children's anxiety caused by their state of flux, of April's lack of progress and of

April's continued poor judgment. We note that during the hearing, the trial court observed that "[o]f particular concern to the Court was the corporeal communication of April Bolin during the proceedings. April was aloof, distant and non-involved during the hearing. At times she appeared to be staring into space, other times in a dull trance. During relevant and important testimony, April was stoic and without emotion."

{¶60} In her brief to this court, April further claims that the trial court did not properly weigh her relationship with her children and that the trial court did not consider April's improvement as a parent. However, as the preceding discussion established, there was ample testimony both positive and negative that the trial court had to weigh. The trial court's decision to place a different weight on testimony than April argues is not error as the decision was supported by clear and convincing evidence.

{¶61} Finally, April argues that the trial court improperly relied on the psychological evaluation of Dr. Hrinko in making its decision to award permanent custody to the agency. First, we note that not only did April's counsel fail to object to the court reviewing Dr. Hrinko's report at the final hearing, but April's counsel also explicitly stated "I'm ok if you review it, sir," in relation to the report. (Tr. at 538). Second, the evaluation was directly relevant to April's ability to parent and was properly admitted before the trial court. Third, in the trial court's

entry, the court explicitly emphasized the children's need for permanency, stating that April's cognitive limitations (elucidated in the report) were not the only factor in terminating April's rights. Based on the foregoing we find that the trial court's decision finding that it was in the children's best interests that permanent custody be awarded to the agency was supported by clear and convincing evidence. Accordingly, April's assignment of error is overruled.

{¶62} For the foregoing reasons, April's assignment of error is overruled and the judgments of the Shelby County Common Pleas Court, Juvenile Division, are affirmed.

*Judgments Affirmed*

**PRESTON and ROGERS, J.J., concur.**

**/jlr**